# DEPARTMENT OF TRANSPORTATION
# BOARD FOR CORRECTION OF MILITARY RECORDS

Application for Correction of
the Coast Guard Record of:

**BCMR Docket No. 2000-194**

Xxxxxxxxxxxxxxxx
xxxxxxxxxxxxxx

# FINAL DECISION

**ANDREWS, Deputy Chair:**

This is a proceeding under the provisions of section 1552 of title 10 and section 425 of title 14 of the United States Code. It was docketed on September 25, 2000, upon the BCMR's receipt of the applicant's completed application.

This final decision, dated April 25, 2002, is signed by the three duly appointed members who were designated to serve as the Board in this case.

## APPLICANT'S REQUEST FOR RELIEF

The applicant, an attorney and commander (CDR; pay grade O-5) in the Coast Guard, asked the Board to correct his military record by removing an officer evaluation report (OER) that he received for the period May 1, 1996, through June 20, 1997. He asked that the disputed OER be replaced by one prepared "for continuity purposes only."

## SUMMARY OF THE APPLICANT'S RECORD AND ALLEGATIONS

The applicant received his commission in 1982 and served in several operational billets until 1990, when he was assigned to attend law school. In 1993, he passed the Florida State Bar and began working in a District legal office as Chief of the Operational Law Branch.

In 1995, the applicant, then a lieutenant commander (LCDR), became the Chief of the General Law Branch for the District. The new principal assistant legal officer, CDR A., became his supervisor. The applicant had known CDR A. since 1983, when they

served together on a cutter, and CDR A. and his wife were the godparents of the appli-
cant's children. CAPT T., the District legal officer, was his reporting officer.

The applicant's performance evaluations up to this time were excellent, with
many highly laudatory comments and marks primarily of 6, with a few 5s and 7s as
well.[1] In addition, his record contains four personal commendation or achievement
awards and several team and unit awards. On the OER immediately precedent to the
disputed OER, CDR A., as his supervisor, assigned the applicant one mark of 7, nine
marks of 6, and five marks of 5.

The applicant stated that in the summer of 1996, he was selected for promotion
from LCDR to CDR and his supervisor, CDR A., was selected for promotion to captain
and frocked. In August 1996, CAPT T. retired, and CAPT A. (formerly CDR A.) became
the District legal officer, as well as the applicant's reporting officer. LCDR B., the new
Chief of the Operational Law Branch, was senior to the applicant and became his super-
visor. However, LCDR B. went on "terminal leave" on April 11, 1997, and retired on
June 1, 1997. Therefore, when it came time to prepare the disputed OER in June 1997,
because the applicant was being transferred to another district, CAPT A. served as both
the supervisor and reporting officer on his rating chain and "was essentially the sole
officer evaluating [his] performance of duty" during the reporting period.

The applicant received the disputed OER, which is reproduced on page 4, below,
on September 25, 1997. He stated that although it was not technically "derogatory"
under the regulations and so no supporting documentation was required, it was
"extremely adverse" with seven marks of 3. Therefore, he filed an OER reply and
decided to apply for relief to the Personnel Records Review Board (PRRB).

*Promotion Review Board*

In the spring of 1998, however, before the applicant applied to the PRRB, a Pro-
motion Review Board (PRB) was convened to determine whether he should be removed
from the promotion list because of the disputed OER. He was slated to be promoted to
CDR on July 1, 1998. On May 6, 1998, the applicant submitted to the PRB arguments
and evidence contradicting the disputed OER and supporting his pending promotion. He
also submitted his then most recent OER, in which his new reporting officer, an
admiral, highly praised his performance and strongly recommended his promotion.

On June 1, 1998, the Promotion Review Board met to consider the applicant's
pending promotion and concluded that his name should not be removed from the list
and that he should be promoted on schedule. The PRB found the following:

---

[1] In an OER, an officer is evaluated on his or her performance in a variety of categories, such as "Specialty
Expertise," "Working with Others," and "Judgment," on a scale of 1 to 7, with 7 being best.

The negative conclusive comments in [the disputed OER] were not supported by specific examples. Where specific examples were given, they were refuted by third party statements or other documentation. ... [T]he board was troubled by the fact that 1): this was the only derogatory OER in his record, 2) the Supervisor was also the Reporting Officer, 3) there was an obvious disparity compared with prior evaluations by this supervisor, and 4) despite the derogatory nature of this OER, there were no Reviewing Officer comments. ... It was obvious that [the applicant] did not please his supervisor, however, the record does not contain sufficient evidence to question his moral or professional qualifications for promotion.

Therefore, the applicant was promoted to CDR on schedule on July 1, 1998.

### Personnel Records Review Board

On September 14, 1998, the applicant applied to the PRRB to have the disputed OER and his reply to it expunged from his record. He submitted the same material he had provided to the PRB and a copy of the PRB's report. In addition, he submitted a statement by CAPT B., who had served as the applicant's supervisor and reporting officer before CAPT A. arrived. CAPT B. stated that the applicant's performance as Chief of the Operational Law Branch was "distinguished" and that he "always anticipated potential problems well and provided outstanding legal support to prosecuting attorneys and Coast Guard personnel." CAPT B. stated that during the evaluation period in question,

all of the [district law specialists, including the applicant and CAPT A.], were operating under demanding and stressful conditions, unusual except in [that district]. It is certainly possible that the [disputed] OER is more a product of transient interpersonal stresses than any real performance faults. ... I did not observe [the applicant during the evaluation period in question] but I find it hard to understand how [the applicant's] qualities and performance could change so drastically in such a short time. ... All Coast Guard officers are fallible human beings. Even the top performers make mistakes. Accordingly, a marking official who decides to emphasize the negative can always focus on a few instances of an officer's poorest performance in an OER. ...

To reach its decision, the PRRB sought and received a statement from CAPT A. regarding the applicant's evidence and allegations. On April 20, 1999, the PRRB found that "[n]o facts appear to be in dispute. Therefore, as a matter of subjective evaluation, the supervisor's statements receive a presumption of regularity unless the Applicant can prove by a preponderance of the evidence that those statements are factually in error." It noted that under Article 10.A.2.e.(1)(b) of the Personnel Manual, it was proper for CAPT A., a division chief, to serve as both the supervisor and reporting officer for the disputed OER after LCDR B. left since the applicant was a direct subordinate of CAPT A.

The PRRB recommended that partial relief be granted by removing the statements shown in footnote 3 on page 16 below. On April 22, 1999, the PRRB's recommendation was approved and the statements were subsequently removed.

**Final Decision in BCMR Docket No. 2000-194**                                    **p. 4**

*Applicant's Response to the PRRB Decision*

      In his application to the BCMR, the applicant submitted all of the evidence and arguments he had submitted to the PRRB and copies of that board's decision and CAPT A.'s statement.  He alleged that, contrary to the PRRB's finding, the facts of his performance are very much in dispute.  He also argued that the PRRB's reliance on CAPT A.'s reassurances of the veracity of the disputed comments ignored the strong, contrary evidence that he submitted.

**Final Decision in BCMR Docket No. 2000-194**                                   p. 5

## MARKS AND COMMENTS IN DISPUTED OER

(The bold letters inserted in the text refer to correspondingly lettered allegations and supporting evidence below.)

| # | CATEGORY | MARK | WRITTEN COMMENTS |
|---|----------|------|------------------|
| 3a | Being Prepared/ Planning | 3 | "Evaluated on specialty (law) and admin expertise. **[A]** [The applicant's] perform-ance declined after completion of the OER preceding his selection for Com-mander. **[B]** He was surprised by developments in criminal prosecution of two environmental law enforcement cases which had been referred by the D7 legal office to the US Attorney in the Virgin Islands. The inexperienced Asst US Atty had incorrectly applied CG LE authority; [the applicant] was slow to realize the serious implications of a loss based on bad reasoning, and slow to provide litiga-tion support to correct the erroneous legal analysis. **[C]** Even then, he did not develop list of environmental enforcement cases he was responsible for managing until directed to do so. **[D]** In high profile criminal prosecution of a cruise line for discharging oil in US territorial seas, ultimately gathered over 9000 pages of CG documents concerning the cruise line from units throughout the CG, but only after his unsuccessful informal attempts to shift responsibility for the work to peers in D7 Marine Safety Staff, and after very specific direction and timetable imposed by [CAPT A.] for accomplishing task. Delay in response needlessly impaired relations with DOJ prosecutors. Even then, he did not take initiative to ensure records were complete until questioned by the DOJ. **[E]** Although completing his second year as Chief, General Law Section, he did not analyze legal basis for major D7 marine safety initiative to apply Caribbean Cargo Ship Safety Code on 1 July 1997. [CAPT A.] found serious flaws in legal basis of initiative in close review as time for implementation approached, then assigned another attorney who worked hard and successfully to remedy legal defects by pushing authority through CG, DOT and [OMB] to ensure CG had enforcement authority before deadline." |
| 3b | Using Resources | 3 | |
| 3c | Getting Results | 3 | |
| 3d | Responsiveness | 3 | |
| 3e | Work-Life Sensitivity | 4 | |
| 3f | Specialty Expertise | 4 | |
| 3g | Collateral Duty | 4 | |
| 4a | Working with Others | 4 | **[F]** "Tends to be overbearing and sarcastic with subordinates when under any pressure and when he believes he is not being observed by seniors. Brought diverse parties to work together on common goals in cases involving large vessels grounding F1 Keys reefs. Effective in working with MSO, state & civilian attorneys in achieving removal of derelict [vessel from] Miami River. Worked easily & well with other attorneys. Participated in Workforce Cultural Audit briefing, Native American and Hispanic Heritage month activities." |
| 4b | Human Relations | 4 | |
| 5a | Looking Out for Others | 3 | **[G]** "Surprised [phrase deleted by PRRB] by requirement for an annual report. Days before Christmas 1996 tasked YNC with completing the report and departed on leave, while she struggled with gathering information from commands through-out the district. Overwhelmed YNC sent e-mail tasking D7 units requiring submis-sion of data soon after Christmas; [CAPT A.] cancelled unit tasking and assigned another attorney to assist YNC." [sentences deleted by PRRB] |
| 5b | Developing Subordinates | 4 | |
| 5c | Directing Others | 4 | |
| 5d | Evaluations | 4 | |
| 6a | Speaking and Listening | 5 | "As Chair of Florida Bar Military Affairs Committee, addressed 80 military attorneys & judges, including Chief Justice of Court of Appeals for the Armed Forces; also addressed local service club & lectured on ethics. Assisted in drafting persuasive response filed with EPA opposing petition for reimbursement of $4 million in clean-up costs from party responsible for discharge of hazardous dredge spoils in Charleston." |
| 6b | Writing | 5 | |
| 9a | Initiative | 3 | **[H]** "Trial Counsel in 2 courts-martial, but delayed in scheduling second court despite approaching detachment, with the result that another attorney had to be assigned to assume duties associated with record of trial. **[I]** Employed CGIS agents to effect service of criminal subpoenas/civil penalty packages, but did not pursue other ideas he was given to test commercial process servers. [continued] |

Final Decision in BCMR Docket No. 2000-194                                    p. 6

| 9b | Judgment | 4 | [J] Passive review of permits proposed by Aids to Nav. Branch for construc-tion/alteration of bridges did not identify obvious issues with admittedly standard language authorizing permittees to close Inter Coastal Waterway for 90 days. Successfully used TQM methods to significantly improve process for replenishing CG account by collecting ATON damage claims. Advocated reassignment of junior attorneys in office to optimize use of limited resources & expand their professional horizons. On own initiative, drafted a ltr for District Commander convincing State of Florida to cooperate in enforcement effort against owners of derelict vessel moored in Miami River and ignoring CG safety & environmental protection efforts. Routinely worked 10-11 hour days & on weekends, if necessary. Maintained physical conditioning regime, incl. Running, weights, walking & boxing. Although well within weight standards, significantly improved physical condition: reduced body fat, added muscle & aerobic endurance. Participated in D7 wellness program, 5k Corporate Run; encouraged others." |
| 9c | Responsibility | 3 | |
| 9d | Stamina | 5 | |
| 9e | Health & Well-Being | 5 | |
| 10a | Military Bearing | 6 | "Exemplary military bearing & appearance at all times provides excellent first impression. Maintains grooming standards, observes military courtesies & wears uniform with obvious pride; requires same of subordinates. Responds profession-ally & diplomatically to wide range of inquiries from U.S./state attys, civilian attys & public every day. Always left favorable impression of self & CG via outstanding service as Chair of the FL Bar Military Affairs Committee, blood drive coordinator & CG presentations for local service org. & schools." |
| 10b | Professionalism | 4 | |
| 10c | Dealing with the Public | 5 | |
| 11 | Leadership & Potential | NA | [K] "[The applicant] was counseled about his performance early and repeatedly during the period. [L] [CAPT T.], D7 Legal Officer until he retired on 31 AUG 96, warned him to correct the decline in his performance. [M] As with the long running difficulties detailed in block 3h in supporting the high-profile cruise line case, he grudgingly accepted positive suggestions for improvement, and responded only to firm direction. Decline in performance unexplained despite opportunities to do so; no apparent personal problems. He has been selected for promotion to O-5 and is departing PCS & will be assigned to independent duty as the legal advisor for JIATF East in Key West. He is not recommended for a supervisory position in the Legal Program." |
| 12 | Comparison Scale | 2 | The Comparison Scale is not actually numbered. The reporting officer is instructed to compare the evaluee with other officers of the same rank whom he has known and assign one of seven possible marks. CAPT A. chose the second lowest mark on the scale, indicating that, in comparison with all the other LCDRs he had known, the applicant was a "good performer, but [with] limited potential." |

## SUMMARIES OF EVIDENCE AND ARGUMENTS ABOUT COMMENTS

The following summaries group (a) the applicant's evidence and allegations to the PRRB concerning each of the negative comments in the disputed OER with (b) CAPT A.'s statement to the PRRB defending each disputed comment, (c) the findings of the PRRB concerning each disputed comment, and (d) the applicant's response, if any, to the findings of the PRRB.

**COMMENT [A]:** "[The applicant's] performance declined after completion of the OER preceding his selection for Commander."

*Applicant's Allegations About [A]*

The applicant alleged that this statement is false. He pointed out that the evaluation period began three months before he was selected for promotion to CDR. He submitted a letter from CAPT T., who served as the legal officer during the first four months of the reporting period. In the letter, CAPT T. stated that during that time, the applicant "continued to provide commendable service ... and was a major contributor to the accomplishments of the ... Legal Office." He stated that the applicant's accomplishments during those four months "may not have matched the spectacular performance reported for some prior periods, [but] there was no marked decline and I continued to be pleased with his output." CAPT T. also suggested that if there were any such decline, it may have been due to CAPT T. himself "pushing the staff too hard and arguably in too many directions" during previous reporting periods. CAPT T. admitted that he gave the applicant a "pep talk" to "redouble his striving" in the summer of 1996.

*CAPT A.'s Defense of [A]*

CAPT A. stated that he cannot explain the decline in the applicant's performance but thinks that the applicant believed that CAPT A. "could not in the end bring myself to report his poor performance." He alleged that the decline is proved by the fact that CAPT T. felt obliged to give the applicant what he "politely terms a 'pep talk'" but which CAPT A. viewed as a warning.

*PRRB's Findings About [A]*

The PRRB found that, while CAPT T. characterized his counseling session with the applicant somewhat differently than CAPT A. did, nothing in CAPT T.'s statement directly refuted the comment about the decline in the applicant's performance. The PRRB also found that CAPT T. provided a "mixed message" concerning the applicant's performance. It held that CAPT A. had adequately supported this comment about a decline in performance with other comments in the disputed OER.

**COMMENT [B]: "He was surprised by developments in criminal prosecution of two environmental law enforcement cases which had been referred by the D7 legal office to the US Attorney in the Virgin Islands. The inexperienced Asst US Atty had incorrectly applied CG LE authority; [the applicant] was slow to realize the serious implications of a loss based on bad reasoning, and slow to provide litigation support to correct the erroneous legal analysis."**

*Applicant's Allegations About [B]*

The applicant stated that the cases in question involved two U.S. ships that had been observed illegally dumping bilge in U.S. waters but were boarded and searched by

the Coast Guard in foreign waters. Both cases had been referred to the U.S. Attorney's office for prosecution before he became Chief of the General Law Branch. He alleged that he worked closely with the two assistant U.S. attorneys (AUSAs) assigned to the cases once they had "ripened." He alleged that he timely provided them with witnesses and legal information about the Coast Guard's jurisdiction and authority and that he reviewed their draft responses to defense motions to suppress the evidence.

The applicant alleged that the AUSA assigned to the first case (AUSA1) asked him for support on December 4, 1996. He orally briefed her on the Coast Guard's enforcement authority under 14 U.S.C. § 89 and on other applicable statutes. She sent him her draft response to review on December 5, 1996. He reviewed it, made comments, and passed it on to CAPT A. He also arranged for witnesses to appear at a hearing on January 15, 1997. He called AUSA1 on January 17, 1997, but she did not return his call.

The applicant alleged that on January 23, 1997, CDR D., an attorney in the Coast Guard's Office of Maritime Law, called him because he too had been asked to review AUSA1's draft response. CDR D. was concerned about the extent to which AUSA1 relied on 14 U.S.C. § 89, "despite the fact that U.S. vessels are always subject to U.S. law no matter where they are located." The same day, the applicant reviewed AUSA1's most recent draft response and briefed CAPT A. On Friday, January 24, 1997, he alleged, CDR D. faxed him the motion to suppress. He told CDR D. that they would respond on Monday, since CAPT A. was out of the office. He sent his comments and supporting materials to CAPT A. on Monday, January 27, 1997.

The applicant alleged that on Friday, January 31, 1997, CDR D. called again and asked him to review the comments he planned to send to AUSA1 on Monday, February 3rd. The applicant and CAPT A. reviewed the comments and provided input on Monday, and CDR D. was able to meet his deadline. The applicant stated that ultimately, AUSA1's response to the motion to suppress relied less heavily on 14 U.S.C. § 89.

With regard to the second case, the applicant stated that he had previously—as Chief of the Operational Law Branch—opposed seizing evidence from the ship in foreign waters since the Coast Guard's authority to do so was "uncertain." However, on January 16, 1997, a second AUSA (AUSA2) asked him in his capacity as Chief of the General Law Branch to review a draft response to a motion to suppress evidence and the motion itself and to provide comments by January 30, 1997. AUSA2 told him that the response had to be submitted by February 3, 1997.

The applicant alleged that he reviewed and prepared comments on the motion and draft response he received from AUSA2. On January 23, 1997, he forwarded the material to CAPT A. and also sent them to CDR D., since this case was so similar to the first case, in which CDR D. was already involved. During the next week, he refined his

comments for AUSA2, but in midafternoon on Thursday, January 30th, he received "substantial" input from CDR D. Therefore, he consulted CAPT A. and told AUSA2 that he would incorporate CDR D.'s comments and provide his comments no later than noon the next day, January 31st, which he did. He alleged that AUSA2 met his deadline. The applicant later arranged for witnesses and reviewed another memorandum for AUSA2.

The applicant alleged that he was never counseled by CAPT A. about any problem with his performance in these cases. In support of his allegations, he submitted copies of his work notes confirming some of the dates of events and the substance of the discussions. One is a copy of an e-mail dated December 4, 1996, from the applicant to CAPT A., in which the applicant stated that that he had discussed 14 U.S.C. § 89 with AUSA1 and referred her to two other statutes that might be more helpful. He also stated that he would prepare comments on the draft and forward the material to CAPT A. for review.

The applicant also submitted a statement from CDR D. CDR D. stated that in late January 1997, he was contacted by the Department of Justice (DOJ) and asked to review the two motions to suppress and draft responses. He stated that after reviewing them, he believed that the legal analysis of the Coast Guard's authority in the draft responses was incorrect given the facts of the cases in question. When he called CAPT A., CAPT A. denied having seen the motions or draft responses and referred him to the applicant. CDR D. then faxed them the latest copies of the draft responses and worked closely with the applicant to address the issues and make recommendations. CDR D. stated that he believed that the issues raised by DOJ were "appropriately and timely addressed."

The applicant also submitted letters from AUSA1 and AUSA2 written in the spring of 1998. The letters praised him highly for his expeditious help in preparing the briefs for the suppression hearings and in identifying legal issues.

### CAPT A.'s Defense of [B]

CAPT A. stated that, although the applicant submitted "an extensive record of his supposed work on two environmental crimes prosecutions," "[t]wo documents from his record refresh my memory about his performance, and undercut his assertions about his proactive work." He stated that an e-mail he sent the applicant on December 4, 1996, reminded him that AUSA1 was at that time "already far along in her efforts to use our general law enforcement authority in 14 USC 89 ... in a relatively small oil spill case," but did not have the applicant's name or phone number. He alleged that CDR D. had to do a lot of work to convince AUSA1 and, later, AUSA2 not to rely on that statute for their two small cases. He alleged that such reliance would have unnecessarily risked the Coast Guard's authority (14 U.S.C. § 89) to enforce drug laws in the Carib-

bean. He alleged that in his memorandum dated January 31, 1997, to AUSA2 in which he apologized for the one-day delay in their response, he gave credit for the "good legal work" to CDR D. because the applicant "was of no help."

### PRRB's Findings About [B]

The PRRB found that, while the applicant may have decided to allow the environmental cases to "ripen," he clearly failed to meet his supervisor's expectation that he proactively manage his environmental cases. It noted that CAPT A. felt compelled to apologize for providing comments one day late, and it found that there is no evidence that CAPT A.'s assessment of the applicant's performance with respect to these cases was erroneous.

### Applicant's Response to PRRB's Decision About [B]

The applicant stated that the PRRB was wrong to fault him for the fact that the response to AUSA2 was one day late because he himself gave CAPT A. his input three days before the deadline, but CAPT A. waited for input from CDR D., which caused their response to be one day late.

**COMMENT [C]: "Even then, he did not develop list of environmental enforcement cases he was responsible for managing until directed to do so."**

### Applicant's Allegations About [C]

The applicant alleged that he maintained files on every case he was responsible for, spoke regularly with the prosecutors, and advised his superiors of significant developments. He alleged that on January 28, 1997, CAPT A. asked him "to create a list of outstanding cases and to submit it by 14 February 1997." He compiled the list, updating the information about each case, and gave it to CAPT A. on February 13th. Thereafter, he continued to update the list as the cases progressed. The applicant alleged that he never knew CAPT A. was unhappy with the fact that he did not previously have such a list and with how he monitored his cases until he read the disputed OER. He alleged that he was never counseled about this matter.

### CAPT A.'s Defense of [C]

CAPT A. stated that he had "to direct [the applicant] to take the obvious corrective action, and impose a deadline, to compile a list of cases for which he was responsible, in an effort to plan the work of the office and to avoid time-consuming surprises from Assistant U.S. Attorneys handling our cases." He alleged that the applicant was being disingenuous in saying that he was surprised CAPT A. was unhappy with his performance.

*PRRB's Findings About [C]*

The PRRB found that the applicant did not prove that CAPT A.'s determination that he needed to require the applicant to prepare a list of his cases because he could not rely on him to monitor them properly was erroneous or that CAPT A.'s decision to mention this action in the disputed OER was improper.

**COMMENT [D]: "In high profile criminal prosecution of a cruise line for discharging oil in US territorial seas, ultimately gathered over 9000 pages of CG documents concerning the cruise line from units throughout the CG, but only after his unsuccessful informal attempts to shift responsibility for the work to peers in D7 Marine Safety Staff, and after very specific direction and timetable imposed by [CAPT A.] for accomplishing task. Delay in response needlessly impaired relations with DOJ prosecutors. Even then, he did not take initiative to ensure records were complete until questioned by the DOJ."**

The applicant stated that during his last year as Chief of the General Law Branch, he served as the District's "point of contact to coordinate litigation support" for DOJ's prosecution of a cruise line company for environmental violations. He submitted a chronology of his work on the cruise line case briefly summarizing what he did to support it each day. He alleged that he ultimately retrieved videotapes and more than 9,000 pages of marine safety records, coordinated the review of the company's proposed compliance plan, and researched many violation and inspection records. He alleged that after receiving a request for records from DOJ, he would consult with the District's Marine Safety Division and then forward DOJ's request to the numerous field units that held the requested information or had placed them in archives. He alleged that the field units generally made a good faith effort to comply timely with DOJ's varied requests. He alleged that he worked almost daily with the District's Marine Safety Division staff, who helped obtain copies of records in the Marine Safety Information System (MSIS).

The applicant alleged that on March 2, 1998, he asked CAPT A. why he thought the applicant had tried to shift responsibility for this work onto the District's Marine Safety Division staff, an accusation CAPT A. had never counseled him about. He alleged that CAPT A. replied that he had sent unauthorized e-mails to the Division staff asking them to respond to DOJ's requests. The applicant alleged that it was completely proper for him to send these e-mails as there was no other way for him to obtain the marine safety records DOJ required except by asking for them from the marine safety offices that maintained those records. He had no other way to access the records DOJ needed.

In support of his allegations, the applicant submitted statements from two officers who served in the District's Marine Safety Division. LCDR M., the Chief of the Marine Response Branch, wrote that the comments in the disputed OER about the

applicant's handling of the cruise line case are not accurate. He stated that the applicant "was extremely helpful and supportive in resolving issues raised by this case." He stated that the applicant worked diligently to get the AUSA assigned to the case to focus his records requests instead of making "global" demands. Furthermore, he stated that "[a]t no time did I feel like [the applicant] was shifting responsibility for this case to our staff." He indicated that normally, the retrieval of records would have been done by the Coast Guard's Investigative Service (CGIS), but the CGIS refused to do so because of "other priorities and commitments."

CDR K., who served first as the Chief of the Marine Response Branch and then as the Deputy Chief of the Marine Safety Division while the applicant was working on the cruise line case, also submitted a statement for the applicant. He stated that the applicant was "very responsive" to the Division's needs and that he "did not perceive any effort to shift responsibility to the Marine Safety Division for gathering documentation on the cruise ship criminal case." He stated that the division had access to the MSIS and therefore retrieved some information requested by DOJ for the applicant but that "this was not considered extraordinary."

Regarding the comment about his delayed response to DOJ prosecutors, the applicant alleged that on his last day at the unit, CAPT A. told him that a delay in finding legible records to replace illegible ones sent to DOJ had made their working relations with DOJ "acrimonious." The applicant alleged that on May 9, 1997, DOJ had asked for new copies of 36 (out of 9,000) pages of records because information on the previously submitted copies had been illegible. However, DOJ initially provided the wrong page numbers for the 36 pages. DOJ provided the correct page numbers on Friday, May 16, 1997. The applicant stated that he assigned the task of getting the 36 new pages from the field offices to a subordinate because he was busy preparing for and trying a special court-martial the following week. The applicant alleged that after the court-martial ended on Thursday, May 22, 1997, he took care of "various post-trial duties." On Tuesday, May 27th, he asked the subordinate about the 36 pages and discovered that nothing had been done. Therefore, he immediately began contacting the various field offices and the Marine Safety Division to get the 36 new pages. By June 10, 1997, he had received 30 of them and sent these to DOJ. On June 13th, he received the remaining 6 from Juneau and forwarded them to DOJ. However, the applicant alleged, DOJ "typically wanted everything 'yesterday'," so the delay may have caused a problem, which "I am willing to accept responsibility for." The applicant alleged that this was the only unnecessary delay he could be held responsible for, though many minor delays in record retrieval were caused by "incorrect case numbers, missing files, records which had been shipped to the archives, etc." Moreover, he alleged, he was never counseled about any problem threatening the Coast Guard's working relationship with DOJ.

Regarding CAPT A.'s comments about timetables, specific direction, and the completeness of records, the applicant alleged that during the evaluation period, CAPT A. gave him deadlines for three small projects. First, when he arrived back at the unit on February 18, 1997, after having been assigned temporarily to another unit, CAPT A. told him that DOJ had inquired while he was away about the completeness of the various document submissions. He provided CAPT A. with copies of all his correspondence with the various field offices. On Friday, February 21, 1997, CAPT A. asked him to review all of the cruise line case records to determine whether they were complete. He alleged that when he happened to come into the office on Saturday, February 22nd, he found an e-mail from CAPT A. stating that the deadline for the completeness review was close of business on Monday. Therefore, he spent 16 hours reviewing the records "to determine whether we had obtained not only those records which DOJ had requested, but rather all available records for both inspections and violations." He found that some field offices had not sent them all available records and so asked them to do so.

The applicant alleged that CAPT A. gave him deadlines on two other occasions: On March 18, 1997, he asked the applicant to prepare an analysis of the cruise line company's inspection cases by March 21st and an analysis of the cruise line company's violation cases by March 26th. He alleged that he met these deadlines.

In support of his allegations, the applicant submitted a statement from CAPT T., the previous legal officer, who stated that he himself had "difficulty meeting DOJ's expectations on several prior occasions and regularly "Shanghaied" the overburdened [Division] staff to help with the process. I believe some of those difficulties were inherent in that rapidly developing area of legal services."

## CAPT A.'s Defense of [D]

CAPT A. stated that the applicant finally gathered the 9,000 documents, but

only after I directed him to do the work, rather than simply refer the requests to the marine safety staff. My own recollection is that he was sullen when I gave him that direction. I personally drafted the letter we sent to request other Districts ... to forward all the records of inspections ... . Prior to that, [the applicant] had repeatedly pursued ineffective, failed methods like sending e-mails asking that the D7(m) staff provide the records in response to increasingly strident demands from the Department of Justice, setting up serial confrontations with the Seventh District marine safety staff ... . On one occasion, [CAPT T., the applicant,] and I had to spend a day ... with the DOJ attorney handling the [cruise line] case to demonstrate our commitment to produce the long-delayed records. Again, [the applicant] is disingenuous in asserting that he hadn't been aware of our strained relations with DOJ.

## PRRB's Findings About [D]

**Final Decision in BCMR Docket No. 2000-194**                                        **p. 14**

The PRRB found that the applicant did not prove that CAPT A.'s expectation that he do more to gather the documents required for the cruise line case than forward DOJ's requests by e-mail to the marine safety staff was unreasonable. It found that he did not prove that CAPT A. was wrong in his perception that the applicant "was not taking the necessary steps to accomplish this task." It found that the record indicates that the applicant accomplished the work only after receiving explicit directions and deadlines. The PRRB found no irregularity in CAPT A.'s documentation of the applicant's failure to meet his expectations.

### Applicant's Response to PRRB's Decision About [D]

The applicant again denied that he had "simply referred" DOJ's requests for documents to the Marine Safety Staff. He alleged that he worked "very closely and extensively with them to respond to the needs of the prosecutor."

The applicant also alleged that during the evaluation period, he handled about 30 information requests from DOJ. He alleged that CAPT A. only set deadlines for three of these—all during February and March of 1997 when he was preparing to prosecute a special court-martial—and that he met all three deadlines.

The applicant alleged that the PRRB's conclusion that CAPT A. imposed the deadline for gathering documents in the cruise line case in February 1997 because he had failed to do the work erroneous. He alleged that the deadline was for gathering documents for a brand new, broader request by DOJ, which sought all documents related to the cruise line, not just the documents DOJ had previously sought in a more specific request. The applicant alleged that the new, broader request arrived while he was temporarily assigned to another unit. This was the work that CAPT A. tasked him with on Friday afternoon, February 21, 1997, as described in his previous statement.

**COMMENT [E]: "Although completing his second year as Chief, General Law Section, he did not analyze legal basis for major D7 marine safety initiative to apply Caribbean Cargo Ship Safety Code on 1 July 1997. [CAPT A.] found serious flaws in legal basis of initiative in close review as time for implementation approached, then assigned another attorney who worked hard and successfully to remedy legal defects by pushing authority through CG, DOT and [OMB] to ensure CG had enforcement authority before deadline."**

### Applicant's Allegations About [E]

The applicant alleged that these comments refer to Operation Safety Net, a program begun in May 1994 to remove substandard foreign freight vessels from U.S. waters and prohibit their entry as of July 1, 1997. He alleged that he was not briefed on the program when he became Chief of the General Law Branch but learned about it gradually through daily interaction with the Marine Safety Division and had no reason

to question its legitimacy. However, on March 14, 1997, CAPT A. asked him to obtain a summary of the program, which he did the same day.

On March 19, 1997, CAPT A. asked him about the legal basis for the program—in particular about whether foreign vessels' compliance with the Caribbean safety code was sufficient to satisfy U.S. safety requirements. The applicant alleged that in response to CAPT A.'s query, he immediately consulted an officer in the Marine Safety Division, who stated that the Division believed that existing regulations provided sufficient discretionary authority to permit the Caribbean safety code to be deemed equivalent to U.S. standards. The applicant alleged that he pointed out that this policy had never been "officially articulated" and should be. On the afternoon of March 19th, he alleged, he prepared a summary of this conversation, e-mailed it to the Marine Safety Division and sent a copy to CAPT A., with a recommendation that the policy be put in writing by the Commandant either in an instruction or in a regulation. He submitted a copy of his e-mail, in which he stated the following:

> ... Unfortunately, however, it appears no one has done a rulemaking project to issue those regulations, which should probably appear in 46 CFR 90.05. There may be enough latitude in the regs, as you suggest, to accept the CCSSC COI's as fulfilling our federal inspection requirement without further action on the part of the Coast Guard. That appears to be the current plan. However, I believe that the basis for doing so should be articulated in writing by [Commandant], either by instruction or, preferably, as a regulation.

On March 24th, CAPT A. tasked another officer with preparing such a document for publication in the Federal Register. The applicant alleged that he assisted that officer whenever necessary, and the document was published in the Federal Register the day before he was transferred from the unit. However, the applicant alleged that the lack of such a document could not be considered a "serious flaw" in the legal basis for Operation Safety Net, as CAPT A. wrote in his OER. He pointed out that apparently none of the attorneys or marine safety personnel at Headquarters who designed and implemented the program from 1994 to 1997 had thought the publication was necessary, nor did his and CAPT A.'s predecessors or anyone in the District's Marine Safety Division think so. Moreover, he pointed out that when CAPT A. drew his attention to the alleged "serious flaw," he responded quickly to CAPT A.'s concerns and made a recommendation that was adopted by the Commandant. Furthermore, he alleged that CAPT A. did not counsel him until his last day at the unit about the fact that he had not spotted the alleged flaw.

In support of his allegations, the applicant submitted several affidavits. CDR C., the Chief of the Compliance Branch of the District Marine Safety Division since July 1994, stated that CAPT A.'s comment in the disputed OER "is simply false. As the marine safety branch chief responsible for implementing this initiative, I was fully aware of the legal basis for implementing Operation Safety Net ... [which] was accepted by [CAPT A.'s predecessor, the Assistant Commandant for Marine Safety and Envi-

ronmental Protection, and the Chief of the Office of Maritime and International Law]
prior to implementation." He alleged that Operation Safety Net's use of the Caribbean
code was proper under existing regulations and that the notice published in the Federal
Register at CAPT A.'s behest was unnecessary.

CDR K., who was the Deputy Chief and Acting Chief of the District Marine
Safety Division and who had previously served as the Chief of the Response Branch,
wrote in support of the applicant's allegations that, after CAPT A. raised the issue about
the Caribbean code, it "was never agreed upon whether or not [additional legal author-
ity] was required" and that the lack of a notice was not considered a "serious flaw."

CDR D., who works in the Headquarters Office of Maritime and International
Law and serves as the "primary legal advisor to program managers for issues related to
domestic and international laws involving marine safety and environmental protec-
tion," also submitted a statement in support of the applicant's allegations. He stated
that his office helped "analyze the legal requirements for implementation" of Operation
Safety Net and that he spoke with CAPT A. about the latter's concerns in 1997. He indi-
cated that after the program got a lot of attention because of its economic impact,
CAPT A.'s recommendation was followed "to ensure that the Chief Counsel [would be]
comfortable with the legal analysis for [a] high profile situation[]."

### CAPT A's Defense of [E]

CAPT A. stated that the applicant "had no role in correcting the fundamental
deficiency in the legal basis for Coast Guard adoption and enforcement of the Carib-
bean Cargo Ship Safety Code. ... Even after I identified the issue, he responded only
with assurances from his peers in the marine safety division that they knew what they
were doing, leading me to assign another officer to accomplish the work that [he]
should have done, and for which he now attempts to claim credit." CAPT A. alleged
that the applicant's claim that the publication in the Federal Register was unnecessary is
"seriously undercut by the quick agreement of those involved at Headquarters, DOT
and OMB to work quickly to repair the flaw."

### PRRB's Findings About [E]

The PRRB found that the applicant failed to prove that CAPT A. was wrong to
have expected him to find the flaw in the legal basis for applying the Caribbean Cargo
Ship Safety Code and to do more than rely on the assurances of his peers in the marine
safety division that there was no flaw. It found no error in the disputed comment.

### Applicant's Response to PRRB's Decision About [E]

The applicant alleged that CAPT A. and the PRRB erred in stating that he relied
on the assurances of his peers in this matter. He alleged that his e-mail dated March 19,

1997, which was the day CAPT A. raised the matter, proves that he did not rely on such assurances.

**COMMENT [F]:  "Tends to be overbearing and sarcastic with subordinates when under any pressure and when he believes he is not being observed by seniors."**

*Applicant's Allegations About [F]*

The applicant alleged that when he saw this comment he asked CAPT A. when he had been overbearing and sarcastic.  He alleged that CAPT A. told him that one day, he saw the applicant standing in a chief yeoman's doorway and that it looked as if he were giving the chief yeoman "a hard time," although he did not overhear their conversation, did not know what they were discussing, and did not stop to inquire or intervene.  CAPT A. also told him that he had "received comments from other people" but would not be more specific.  The applicant alleged that CAPT A. never counseled him about this alleged problem.  He also submitted signed statements from the chief yeoman and two other subordinates in support of his allegation that he was not overbearing or sarcastic with his subordinates.

The chief yeoman stated that she could not remember the applicant ever raising his voice at her while standing in her office door.

A yeoman first class stated that she worked in the legal office and that the applicant was always available and willing to help her and "was never short, overbearing or sarcastic with me or the people I set up appointments with for him. ... [H]e was always professional ... [and] sensitive to his peers' needs and would help a soldier in need, whether personal or professional.  I would work with him anytime."

A lieutenant junior grade whom the applicant supervised stated that he never knew him to be overbearing or sarcastic.

CAPT T. stated in his letter that during the two years he was the District legal officer he "never observed or received reports providing any indication of [the applicant] in an 'overbearing' or 'sarcastic' manner with subordinates."

In addition, the applicant alleged that he had asked another lieutenant junior grade in the office and LCDR B. whether they could recall him ever being overbearing or sarcastic and that they told him they could not.

*CAPT A.'s Defense of [F]*

CAPT A. reaffirmed this comment.  He alleged that the comment is based not only on the incident with the chief yeoman but also on "reports of similar behavior

from others which I chose not to discuss with him, and choose not to detail at this point."

*PRRB's Defense of [F]*

The PRRB found that neither the chief yeoman's statement that she could not remember the incident described by CAPT A. nor the other subordinates' statements that the applicant was not overbearing or sarcastic were sufficient to overcome the presumption of regularity accorded CAPT A.'s assessment of the applicant's bearing and attitude toward subordinates.

*Applicant's Response to PRRB's Decision About [F]*

The applicant objected to the PRRB's acceptance of the truth of this comment since CAPT A. was only able to refer vaguely to one incident, which neither the applicant nor the enlisted person involved could remember. He alleged that the signed statements he provided prove that CAPT A.'s sweeping allegation about his demeanor with subordinates is erroneous.

**COMMENT [G]: "Surprised [phrase deleted by PRRB] by requirement for an annual report. Days before Christmas 1996 tasked YNC with completing the report and departed on leave, while she struggled with gathering information from commands throughout the district. Overwhelmed YNC sent e-mail tasking D7 units requiring submission of data soon after Christmas; [CAPT A.] cancelled unit tasking and assigned another attorney to assist YNC." [sentences deleted by PRRB]** [2]

*Applicant's Allegations About [G]*

The applicant alleged that this comment is false and misleading. He alleged that in 1994 and 1995, the chief yeoman (YNC) had been "solely responsible for administering" their unit's Freedom of Information Act (FOIA) report, which is the report referred to in the comment. In 1996, LTJG D., the applicant's subordinate, was designated to serve as the office's FOIA coordinator. He alleged that thereafter, LTJG D. dealt with FOIA legal issues while the YNC continued to handle most administrative matters.

_____

[2] The PRRB deleted the first phrase, "for second year," from this comment because references to performance during previous evaluation periods are prohibited under Article 10.A.4.f.11. of the Personnel Manual. The PRRB also deleted the final sentences from this comment because it found that they improperly referred to performance in a previous evaluation period: "Ineffective supervision of law student sent by [university] to [District] legal office. Missed opportunity to make productive use of a potentially valuable student resource; assigned to what amounted to a make-work project of little use ... ; same information available from other sources." The applicant submitted evidence that the law student left the office before the evaluation period began and that while he was assigned to the office, he worked on several significant projects, which were cleared beforehand by CAPT A. He also proved that the student had received a letter from CAPT T. detailing his work for the office and commending his performance.

The applicant alleged that their office normally received a reminder from Coast Guard Headquarters in December to prepare the annual FOIA report and submit it by a specified date. In 1996, he alleged, the reminder arrived on December 19th and specified a submission date of January 2, 1997. He alleged that he immediately printed out the e-mail reminder and asked LTJG D., the FOIA coordinator, to prepare the report. He alleged that LTJG D. and the YNC discussed the matter and agreed that the YNC would e-mail each of the District's units "to obtain their input for the report, as she had done in previous years." She did so the same day and requested the units' responses by December 30, 1996. However, later that day, CAPT A. sent an e-mail to each of the units canceling the YNC's request for information. He ordered her to notify the Commandant that their report would be late and to collect the information from the units after the holidays. The applicant alleged that he left for a week of pre-approved leave on December 20th and that the YNC collected the information for the FOIA report after the holidays and submitted it to Headquarters on January 7, 1997. The applicant alleged that CAPT A. never told him he was upset with how the FOIA report was handled.

In support of his allegations, the applicant submitted a copy of the December 19th e-mail message from Headquarters and a statement from the YNC. The YNC confirmed the applicant's allegations about how their office normally handled the FOIA report and how it was handled in 1996/97. She stated that after she had sent out the usual e-mail to the units, CAPT A. "told me he did not want me to task the units on such short notice and to notify the units to disregard my previous request for information. He also requested that I contact Headquarters to inform them that submission of our FOIA report will be delayed."

In addition, the applicant submitted a copy of an e-mail sent by CAPT A. to the YNC in which CAPT A. said, "You should have checked with me before sending out tasking like this. This is not a new report; we knew about the requirement and should have kept records, or made other provisions for gathering the information, rather than tasking everyone in the District with providing information on short notice over the holidays. LCDR B. will give you direction."

### CAPT A.'s Defense of [G]

CAPT A. alleged that as Chief of the General Law Branch, the applicant should have planned for the submission of the FOIA report and should not have waited until the reminder arrived on December 18, 1996. He alleged that the applicant departed on Christmas leave without informing CAPT A. about the report. When he learned of it, he felt obliged to rescind the chief yeoman's demand for input from the other offices before the New Year, and he himself provided assistance in gathering the data.

*PRRB's Findings About [G]*

The PRRB found that, while the phrase "for second year" should be removed because it reflected on the applicant's performance during a previous reporting period, the rest of the comment about the FOIA report should remain unchanged. It found that the applicant did not prove that CAPT A. was wrong to have expected him, as Chief of the General Law Branch, to ensure that preparations for the annual FOIA report began before the "short fuse message" was received from Headquarters on December 18, 1996.

**COMMENT [H]: "Trial Counsel in 2 courts-martial, but delayed in scheduling second court despite approaching detachment, with the result that another attorney had to be assigned to assume duties associated with record of trial."**

*Applicant's Allegations About [H]*

The applicant alleged that this comment is misleading because it implies that he unnecessarily delayed the second court-martial and failed to perform his post-trial administrative duties. He alleged that he accepted an invitation to prosecute the case, which involved falsification of galley records and theft of funds, in August 1996, but the Coast Guard did not complete its investigation of the case until January 21, 1997. He began drafting charges on January 28th and spent much of the next week interviewing witnesses and collecting copies of the falsified records, receipts, and other evidence. He finished drafting charges on February 10, 1997, and submitted them to LCDR B. From February 11th through the 17th he was temporarily assigned to another office. On February 20th, LCDR B. told him to draft dereliction of duty charges against the embezzler's supervisors, who had failed to prevent or detect the theft. Therefore, he collected the galley's audit reports and prepared new charges, but on February 27th he was told to forget about those charges. He e-mailed his final draft of the charges to the defendant's new unit on March 3, 1997, because the new commanding officer had convening authority. The charge sheet was finalized on March 17th.

On March 27, 1997, the commanding officer convened the special court-martial and referred it for trial. Because of the busy schedule of the defense counsel, the trial was set for May 14, 1997. The applicant alleged that CAPT A. approved this trial date. The applicant alleged that he prepared for the trial and performed his other duties until Friday, May 9th, when the defense called with a plea offer, which the applicant and convening authority quickly countered. On Monday, May 12th, the defense submitted a revised plea offer, which the applicant reviewed, modified, and submitted to the convening authority and CAPT A., who both approved it. After the plea agreement was made, the defense asked the judge for a continuance until May 22nd to gather witnesses for the sentencing phase of the trial. The applicant alleged that his research indicated that the request was not unreasonable under the circumstances of the case and would likely be granted, so he decided not to oppose the motion, and the judge granted a continuance until May 21st.

The applicant alleged that the court-martial was held on May 21, 1997, and the judge announced the sentence the next day. He alleged that he began performing his post-trial administrative duties the same day. The court reporter submitted the transcript of the trial on Friday, June 6th, but he had to return it for numerous corrections. On June 11th, the court reporter again submitted an unsatisfactory transcript. On June 12th, the applicant asked another court reporter to listen to the tape and make corrections. On June 16th, the third and final version of the transcript was completed. He assembled the record of trial and sent it to the judge and defense attorney the same day. On June 17th, he alleged, he drafted and submitted for approval the remaining paperwork for the trial.

The applicant alleged that after June 17th, nothing remained to be done except to process the record of trial when it was returned by the judge. Since his last day at the unit was June 20th, another attorney was designated to do this. He admitted that that attorney also ended up physically reassembling the record of trial but, he alleged, this was only because the paperwork "apparently came apart during shipment to the judge and became disorganized, prompting the judge to send it back for reassembly."

The applicant alleged that these facts show that he never intentionally or negligently delayed the trial. Although he decided not to contest the one week's continuance, he alleged that it made little difference since he was able to complete virtually all of the post-trial duties before his departure. He further alleged that he was never counseled about the matter.

In support of his allegations, the applicant submitted a trial "Chronology Sheet" confirming many of the dates he cited. In addition, he submitted a signed statement from the attorney who was designated to complete the remaining post-trial duties after the applicant's departure. That attorney stated that the applicant had prepared all the documents required for him to finish processing the paperwork. He also stated that "[a]fter simply recompiling the trial record and resending it to the Military Judge, there was very little that I had to do to complete the post-trial work."

The applicant also submitted a letter of appreciation dated June 19, 1997, from the commanding officer of the Coast Guard Finance Center. In researching and prosecuting the case, the applicant had identified some potential procedural improvements that could prevent future similar crimes and had brought these to the attention of the center. As a result of his work, the center modified some procedures and policies.

### CAPT A.'s Defense of [H]

CAPT A. admitted that slow investigations often caused delays in prosecuting cases, but he alleged that "even if [it's] true" that the investigation was delayed, "pro-

active trial counsel avoid such problems by monitoring and working with their investi-gators." Moreover, he alleged, the applicant tried to avoid trying the cases by asking to be detached early from the unit. CAPT A. also alleged that the military judge returned the trial record because the applicant had just stuffed it in a Federal Express box with-out organizing it properly. He alleged that the applicant had done this even though a court reporter protested his actions.

### PRRB's Findings About [H]

The PRRB found that the fact that the other attorney had little work to do on the second court martial after the applicant left is irrelevant since CAPT A. had ordered the applicant to complete the trial prior to his detachment. The PRRB also relied on CAPT A.'s statement that the applicant only prosecuted the case after his request to detach was denied and he was ordered to complete the trial.

### Applicant's Response to PRRB's Decision About [H]

The applicant strongly denied the allegation that he tried to avoid prosecuting the trials by detaching from the unit. He alleged that he was informed of his upcoming reassignment on February 26, 1997, at which time he was already preparing for the court-martials. He alleged that he never purposely delayed the trials and that he never asked to detach prior to completing the trials. He alleged that after receiving the assignment he tried to work out a departure date which would not unduly burden his office since LCDR B. was going on terminal leave on April 11, 1997.

The applicant alleged that in a conversation with a captain in the Coast Guard Personnel Command's Officer Assignment Branch on March 7, 1997, he proposed a detachment date of June 20, 1997, rather than August 1, 1997, to allow him to complete the second trial, which was scheduled for May 14th, and to accommodate the needs of his future command. He indicated that the future command wanted him to detach soon because the officer he was replacing needed to take leave to arrange his affairs since he was being transferred to Hawaii. The applicant alleged that both CAPT A. and the future command agreed with the proposed June 20th detachment date.

In support of these allegations, he submitted copies of his work notes for March. They indicate that he held several conversations with CAPT A., who resisted commit-ting to a detachment date for him because of LCDR B.'s departure; with LCDR B., who was going on terminal leave and retiring; and with the Officer Assignment Branch, which told him that his current command "need[ed] to communicate with" his future command to settle on a detachment date.

**COMMENT [I]: "Employed CGIS agents to effect service of criminal subpoenas/civil penalty packages, but did not pursue other ideas he was given to test commercial process servers."**

### Applicant's Allegations About [I]

The applicant alleged that in July 1996, he researched ways to improve service of notice on persons charged with a civil marine safety violation. Some charges were being dropped when notices, which were usually sent by certified mail, were returned as undeliverable. The applicant alleged that he asked CGIS about their ability to serve process but was told that they were too busy. Therefore, he contacted and researched several professional process-serving companies and recommended that they hire one, on an experimental basis, to try to serve process on the violators.

The applicant alleged that two notices were sent to the professional process server in August 1996. He also provided the company with additional personal information about the violators that he had received from CGIS. However, after several months and numerous failed attempts to locate the violators, the professional process server admitted defeat. When he told CAPT A. about it, CAPT A. suggested trying other companies, but the applicant stated that in light of his experience with the first company, he thought it "would be a waste of time and money." He stated that his research had shown that the other companies used the exact same databases and procedures to try to find people as the first company he had tried. He alleged that LCDR M., the Chief of the Port Safety and Security Branch, supported his position, and so they abandoned the attempt to use commercial process servers for those two cases. He alleged that he was never counseled about his performance in this matter.

In support of his allegation, the applicant submitted a statement from LCDR M. LCDR M. stated that when he contacted the legal office about the undeliverable notices, the applicant was very helpful. LCDR M. stated that that after the failure of the first commercial process server, he did not support further attempts to use commercial process servers because of the lack of an established funding source and because he "felt that the work [the applicant] had accomplished to address this issue had gone as far as possible and was not worth pursuing further for the small number of cases that were involved in this process."

### CAPT A.'s Defense of [I]

CAPT A. alleged that the applicant only "grudgingly" agreed to try using private-sector process servers to serve notice in civil penalty cases. He alleged that the applicant was "otherwise unresponsive, and failed to use his legal background or initiative to find any advantage for the Coast Guard in the thriving private sector industry in serving subpoenas."

### PRRB's Findings About [I]

The PRRB found that the perceptions of LCDR M. about the applicant's handling of the experiment with commercial process servers did not overcome the presumption of regularity afforded CAPT A.'s comment that the applicant acted on his suggestion "grudgingly" and failed to pursue certain ideas. It also pointed out that LCDR M. was not privy to the applicant's and CAPT A.'s communications about the problem.

### Applicant's Response to PRRB's Decision About [I]

The applicant repeated his allegations concerning his research and experimental use of a commercial process server. He alleged that after the experiment failed, he and LCDR M. recommended to CAPT A. that the experiment end and that they retrieve the case files from the process servers because the applicant's research had shown that all of the commercial process servers used the same methods. He alleged that CAPT A. concurred and signed a letter to retrieve the files.

**COMMENT [J]:** "Passive review of permits proposed by Aids to Nav. Branch for construction/alteration of bridges did not identify obvious issues with admittedly standard language authorizing permittees to close Inter Coastal Waterway for 90 days."

### Applicant's Allegations About [J]

The applicant alleged that this comment was false and misleading because his "review of bridge permits was not 'passive', there were no 'obvious' issues with the language of the permit and the language in question does not authorize permittees to close waterways for 90 days." He alleged that as Chief of the General Law Branch, one of his duties was to review draft permits prepared by the Bridge Section for legal sufficiency. He alleged that on more than one occasion, he challenged the legal sufficiency of an environmental impact study for a proposed bridge or the Bridge Section's conclusion that no such study was necessary.

The applicant alleged that he also paid close attention to the text of the permits, much of which is "boilerplate" taken from the Bridge Administration Manual. After he completed his review, each permit package would be reviewed by the principal assistant legal officer and the legal officer before being sent to the District Commander. He alleged that he reviewed and commented upon five or six such bridge permits while CAPT A. was the principal assistant legal officer and CAPT T. was the legal officer. He alleged that he reviewed another five or six permits during the evaluation period for the disputed OER after CAPT T. left the unit.

The applicant alleged that in January 1997, after CAPT A. had become the legal officer, he reviewed a bridge permit package, made comments about the necessity for an environmental impact statement (EIS), and forwarded it CAPT A. On January 10, 1997, he alleged, CAPT A. mentioned for the first time that he was concerned about

some of the boilerplate in the permit. CAPT A. told him he thought the language might allow the permittee to close the Intercoastal Waterway for up to 90 days without notifying the Coast Guard. CAPT A. wanted alternative language drafted for the permit and asked the Marine Safety Division to review the package. The boilerplate language to which CAPT A. objected appears in the Coast Guard manual as follows:

> ... All work shall be so conducted that the free navigation of the waterway is not unreasonably interfered with and the present navigable depths are not impaired. Timely notice of any and all events that may affect navigation shall be given to the District Commander during construction of the bridge. The channel or channels through the structures shall be promptly cleared of all obstructions placed therein or caused by the construction of the bridges to the satisfaction of the District Commander, when in the judgment of the District Commander the construction work has reached a point where such action should be taken, but in no case later than 90 days after the bridge has been opened to traffic.

On January 17, 1997, the applicant alleged, the Chief of the Bridge Section called, inquiring about the status of the permit package. The applicant retrieved the package from the Marine Safety Division, and CAPT A. asked him to draft a memorandum to the Aids to Navigation Branch regarding their concerns over the EIS and the boilerplate language. He did so the same day, and CAPT A. sent the memorandum on January 22, 1997, and scheduled a meeting with the Bridge Section and Marine Safety Division for January 23rd. The applicant alleged that the Chief of the Bridge Section agreed with him about the EIS but disagreed with CAPT A.'s concerns about the boilerplate. CAPT A. withdrew his objection, and the permit package was forwarded to Headquarters. A copy of the permit dated February 17, 1997, which the applicant submitted, contains the boilerplate language from the manual without the final phrase "but in no case later than 90 days after the bridge has been opened to traffic."

In support of his allegations, the applicant submitted a statement signed by CAPT W., the Chief of the Bridge Section. CAPT W. stated that when CAPT A. first told him about his objections to the boilerplate in January 1997, he immediately objected because it had been developed "with extensive legal review, was mandated for use as standard conditions for any bridge permit [citation omitted], and had successfully been used throughout the country since the Bridge Program had been transferred from the Army Corps of Engineers to the Coast Guard in 1967." He confirmed the applicant's allegations about the EIS and CAPT A.'s withdrawal of his objection to the boilerplate. He stated that CAPT A. told him he would "address his concerns directly to the Commandant at a later date if he was able to convince the District Commander action should be taken." CAPT W. stated that CAPT A. brought the issue up again in 1998 (after the applicant left) with respect to another permit but, to his knowledge, never raised his concerns to the Commandant.

CAPT W. stated that overall, the applicant had reviewed at least 12 bridge permit packages and that his work had resulted in several corrections and improved

environmental documentation. He stated that none of the permits reviewed by the applicant had been challenged legally.

The applicant also submitted a copy of a statement by CDR K., who was the Deputy Chief of the Marine Safety Division in January 1997. CDR K. stated that the Bridge Section was adamant about not changing the boilerplate. Therefore, because of CAPT A.'s concerns, the Marine Safety Offices and District Marine Safety Division were given an opportunity to review bridge permit packages before final approval.

The applicant also submitted copies of the permit and interoffice correspondence about the permit and CAPT A.'s concerns. In e-mail messages written by CAPT A. on January 17, 1997, he stated that the Coast Guard's "recent experience with the closure of the ICW in Savannah due to bridge construction prompted me to take a fresh look in reviewing the permit." He indicated that he found some of the boilerplate too general and ambiguous and that he would not recommend that the District Commander approve the permit.

### CAPT A.'s Defense of [J]

CAPT A. alleged that "[a]s with his performance on the Caribbean Cargo Ship Safety Code, [the applicant] uncritically accepted the assurances of the programs for which he was assigned to provide legal advice that they knew what they were doing. In this case, he failed to bring independent thought and analysis to bear even after the Bridge Program was criticized for unthinking approval of a request to close the Intra-Coastal Waterway for five days. ... Also, I do not agree that [he] was at all proactive on resolving environmental concerns. He became somewhat more active after I pointed out the contrast between the good work of [another unit] in actively dealing with environmental law issues involving endangered species and wetlands in their work ... ."

### PRRB's Findings About [J]

The PRRB found that the applicant failed to prove that CAPT A. was wrong to expect him not to accept uncritically "the assurances from the programs for which they were assigned to provide legal advice that those programs knew what they were doing." The PRRB found that the ultimate inclusion of the boilerplate in the permit did not prove that CAPT A. was wrong to have expected the applicant to spot the issue and to have documented his failure to spot the issue in the disputed OER.

### Applicant's Response to PRRB's Decision About [J]

The applicant denied that his review of bridge permits was "passive" and pointed to CAPT W.'s statement on his behalf. He also argued that if the issue CAPT A. had with the boilerplate was as "obvious" as he claimed, it would have been noticed

during the previous 30 years, and it would have been corrected after CAPT A. raised the issue.

**COMMENT [K]: "[The applicant] was counseled about his performance early and repeatedly during the period."**

### Applicant's Allegations About [K]

The applicant alleged that this comment is false. He alleged that when he asked CAPT A. about it, CAPT A. referred to a counseling session conducted at the end of the previous reporting period by CAPT T. and to meetings in which they had discussed goals for the General Law Section. The applicant alleged that in September 1996, CAPT A. asked the section chiefs to prepare a list of goals for their sections. When he met with CAPT A. and LCDR B. on September 23, 1996, to discuss the goals, his list "matched up very closely with those which [CAPT A.] had in mind." He alleged that he met with CAPT A. about the goals on November 18, 1996, and that CAPT A. stated he was pleased with their progress.

The applicant alleged that the first time CAPT A. indicated any displeasure with his performance was on June 16, 1997, four days before he left the unit. When he realized that the captain had not organized a frocking ceremony for him or recommended him for an end of tour award, he asked him if he was unhappy with his performance. CAPT A. raised, for the first time, displeasure with the applicant's review of Operation Safety Net, with his assistance to the Aids to Navigation Branch, and with the delay in sending legible copies of records to DOJ. The applicant alleged that "this was the first time [the applicant] had ever been informed that there was any problem with [his] performance."

The applicant alleged that after receiving the disputed OER, he asked LCDR B. if he could remember the applicant being counseled about his performance. He alleged that LCDR B. could not recall that either he or CAPT A. ever counseled the applicant about his performance. LCDR B. allegedly stated that he remembered CAPT A. occasionally complaining about receiving work late from the applicant but did not know if it was, in fact, late and did not know if CAPT A. ever discussed it with the applicant.

### CAPT A.'s Defense of [K]

CAPT A. alleged that he met with the applicant approximately every two months during the reporting period "to have him report on his accomplishments in an attempt to spur him along. I routinely commented during our meetings that we all write our own OERs in that we each have responsibility for our own performance and for striving for achievements which can be reported on OERs." He stated that he always finds something about an officer's performance to praise in such meetings but does not remember ever telling the applicant there were no problems with his perform-

ance. He alleged that the applicant's claim that he was surprised by the criticisms in the disputed OER is "disingenuous." He alleged that the applicant must have known he was displeased with his performance since, when LCDR B. went on terminal leave, he did not ask the applicant to stand in as the military justice advisor because he "could not rely on him to work independently or trust him to handle sensitive military justice issues."

CAPT A. also alleged that, after seeing the applicant's statement concerning his conversation with LCDR B., he called LCDR B. and asked him about it. He alleged that LCDR B. indicated that he had declined to make a statement on the applicant's behalf. CAPT A. also alleged that the only claim in the applicant's statement about his conversation with LCDR B. that the latter said was true was the following sentence: "He [LCDR B.] indicated that [CAPT A.] occasionally complained to him that some of my work was submitted late, but he ([LCDR B.]) suggested that [CAPT A.] discuss it with me directly." CAPT A. alleged that LCDR B. told him that rest of the applicant's claims about what LCDR B. stated were inaccurate.

### PRRB's Findings About [K]

The PRRB noted that under Article 10.A.1.b.(2) of the Personnel Manual, the applicant was ultimately responsible for finding out what was expected of him, obtaining sufficient feedback, and adjusting his performance accordingly. It found that the record shows that CAPT A. "provided direction to Applicant, who failed to meet his expectations."

### Applicant's Response to PRRB's Decision About [K]

The applicant alleged that the PRRB's interpretation of the regulations on counseling would place no obligation on a supervisor to provide performance feedback to a subordinate. He denied that he was counseled at two-month intervals, as CAPT A. alleged. He alleged that his review of his work notes showed that, after the "pep talk" with CAPT T. on June 14, 1996, CAPT A. could be considered to have counseled him only on the following occasions:

- On June 24, 1996, CAPT A. complained to him about some late work, asking the applicant, "Did you think I wouldn't notice."

- On September 23, 1996, they met to discuss goals and projects.

- On September 30, 1996, the applicant requested a meeting because he had heard that CAPT A. was upset with his work in drafting a letter. CAPT A. said he was upset because the applicant took two weeks to draft the letter and that the letter did not adequately support the proposed charges. The applicant pointed out that CAPT A. had asked him to draft the letter on Friday, September 20th, by the "next

Wednesday or Thursday" and that the applicant had submitted the draft on Thursday, September 26th. He alleged that CAPT A. reviewed the letter that afternoon and returned it to him for some changes and that the applicant made the changes and returned it to him on Friday morning. He alleged that CAPT A. retracted his accusation that the draft was late, but refused to tell him specifically how the draft was lacking and said he would fix it himself.

• On November 18, 1996, they met to discuss progress on the goals and projects, and CAPT A. did not mention any problems.

• On January 30, 1997, CAPT A. became angry with the applicant because he was surprised at a morning briefing to hear about a brand new project that his office was to work on but that he knew nothing about. The applicant alleged that CAPT A. did not know of the project because he had not opened or read the applicant's e-mail on the topic.

• On February 5, 1997, CAPT A. informed the applicant that he should have checked with CAPT A. before changing a subordinate's status from "break-in" to "duty." The applicant returned the new attorney to break-in status.

• On June 20, 1997, the applicant requested a meeting when he became aware that CAPT A. would not be recommending him for an award or holding a frocking ceremony for him. CAPT A. mentioned only that he "could have done more" with the process servers, should have seen the problems with the authority for Operation Safety Net, and did not supply DOJ with requested documents in a timely manner.

The applicant submitted copies of his work notes that referred to these incidents.

**COMMENT [L]: "[CAPT T.], D7 Legal Officer until he retired on 31 AUG 96, warned him to correct the decline in his performance."**

*Applicant's Allegations About [L]*

The applicant alleged that the mention of another officer's name violates Article 10.A.4.f.8. of the Personnel Manual. He also alleged that the counseling session, which occurred on June 14, 1996, concerned his performance during the previous reporting period and that the reference to it therefore violated Article 10.A.4.f.11. About the content of that session, the applicant alleged the following:

> Although the numbers and comments [in the previous OER] were very favorable, [CAPT T.] encouraged me to find ways to be more productive. He acknowledged that I had been performing the duties of two attorneys throughout much of the reporting period due to PCS transfers, TAD assignments, etc. and that I put in a lot of "overtime".

However, he was concerned that some projects, such as a navigability determination, had taken too long to complete.

Although [CAPT A.] was present at this session as my Supervisor, he made no comments at all. This was somewhat surprising to me, since he and I had previously agreed that the navigability determination in question was not a top priority and could be assigned to the law student intern ... when he reported aboard in January 1996.

In support of his allegations, the applicant submitted a statement from CAPT T., who stated that the applicant was a fine officer who continued to provide commendable service to the Coast Guard during the captain's last four months at the unit, which were the first four months of the evaluation period for the disputed OER. Regarding the counseling session on June 14, 1996, CAPT T. stated that while the applicant's "accomplishments near the end of my tour may not have matched the spectacular performance reported for some prior periods, there was no marked decline and I continued to be pleased with his output. I would not denominate my counseling as a 'warning.' In my view, it was more in the nature of a pep talk to encourage a fine officer to redouble his striving to provide the exceptional service upon which I had come to rely."

### CAPT A.'s Defense of [L]

CAPT A. referred to his comments with respect to comment **[A]**. He also alleged, regarding the applicant's allegation about the delay of the navigability determination, that he never agreed that it could be delayed for so long. He alleged that the applicant "repeatedly missed deadlines to submit the work, and ... when he finally submitted it, I had to rewrite it because the quality was so poor."

### PRRB's Findings About [L]

The PRRB found that the provision of the Personnel Manual prohibiting the naming of another officer in the comments of an OER was not in effect when the disputed OER was prepared. It also found that the applicant did not prove that the alleged decline in his performance, which was the cause of the "pep talk," was not happening during the evaluation period for the disputed OER, rather than the previous reporting period.

**COMMENT [M]: "As with the long running difficulties detailed in block 3h in supporting the high-profile cruise line case, he grudgingly accepted positive suggestions for improvement, and responded only to firm direction."**

### Applicant's Allegations About [M]

The applicant alleged that this comment is false, as he "always tried to be responsive to all of my customers, especially my boss." He alleged that he was never counseled about how he accepted "positive suggestions for improvement." He alleged

that the only such suggestion he could recall was CAPT A.'s suggestion that he try other commercial process servers.

### CAPT A.'s Defense of [M]

CAPT A. alleged that he directed the applicant to develop the list of cases he was supposed to be monitoring to "avoid additional time-consuming surprises like the one from [AUSA1]." He alleged that he personally had to draft the letter the applicant used to obtain information sought by DOJ for the cruise line case since the applicant's methods were so ineffective. He also alleged that he imposed deadlines for the applicant's work because he could not "rely on him to use initiative and judgment in scheduling his own work."

### PRRB's Findings About [M]

The PRRB found that the applicant did not prove that CAPT A.'s assessment of his attitude and responsiveness was in error.

## VIEWS OF THE COAST GUARD

### Advisory Opinion of the Chief Counsel of the Coast Guard

On February 28, 2001, the Chief Counsel of the Coast Guard submitted an advisory opinion in which he recommended that the Board deny relief in this case.

The Chief Counsel argued that Board should apply the following standards in deciding whether to grant relief:

> To establish that an OER is erroneous or unjust, the applicant must prove that the challenged OER was adversely affected by a clear, material error of objective fact, factors "which had no business being in the rating process," or a clear and prejudicial violation of a statute or regulation. *Germano v. United States*, 26 Cl. Ct. 1446, 1460 (1992); *Hary v. United States*, 618 F.2d 11, 17 (Cl. Ct. 1980); CGBCMR Dkt No. 86-96. In proving his case, an applicant must overcome a strong presumption that his rating officials acted correctly, lawfully, and in good faith in making their evaluations under the Coast Guard's Officer Evaluation System. *Arens v. United States*, 969 F.2d 1034, 1037 ([Fed. Cir.] 1992); *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979).

> Moreover, an applicant may only rebut this presumption by clear, cogent, and convincing evidence to the contrary. *Decision Deputy General Counsel* in BCMR Case No. 2000[-037] dated November 20, 2000 *citing Muse v. United States*, 21 Cl. Ct. 592, 602 (1990). In the absence of compelling circumstances, an OER will not be ordered expunged unless the Board finds that the entire report is infected with the errors or injustices alleged; unless the Board finds that every significant comment in the report is incorrect or unjust; or unless the Board finds it impossible or impractical to sever the incorrect or unjust material from the appropriate material. BCMR No. 151-87, *cited in* BCMR 106-91, *et al.*

In recommending denial of relief, the Chief Counsel adopted the decision of the PRRB and an analysis of the case provided by the Coast Guard Personnel Command (CGPC). He alleged that the PRRB and CGPC had "exhaustively assessed the evidence in the record and independently concluded that Applicant failed to rebut the strong presumption that his Supervisor/Reporting Officer acted correctly, lawfully, and in good faith." He alleged that the applicant did not provide the clear, cogent, and convincing evidence required to prove that his OER was in error or unjust.

### Memorandum of the Coast Guard Personnel Command

CGPC stated that "[u]pon review of the new evidence submitted, it is clear that there is a significant difference of opinion between Applicant and [CAPT A.] regarding interpretation of the facts. The new evidence does not, however, provide clear and convincing proof that the PRRB's conclusions were incorrect, nor does the evidence overcome the presumption of regularity that the PRRB relief upon."

CGPC stated that its review of the evidence revealed frequent communication between the applicant and CAPT A. and "a number of instances in which the applicant had opportunities to clarify expectations, as well as infer a divergence between his own approach and the expectations of his supervisor."

CGPC stated that the applicant's criticism of the PRRB's decision "misses the point that his superior was broadly dissatisfied with how he conducted himself as a manager and leader as well as a project officer." CGPC stated that the comments in an OER are merely examples of an officer's performance cited by the reporting officer to support the assigned numerical marks. Therefore, "whittling away at the examples cited in the comments negates the overall assessment of the rating official. If comments are clearly factually incorrect, ... then they should be removed. However, if they are merely challenged on the basis of interpretation of events, the presumption of regularity favors the rating official's judgment."

CGPC stated that the decision of the PRRB was correct and appropriate and "is in no way impugned by the new evidence submitted with the BCMR application."

### APPLICANT'S RESPONSE TO THE VIEWS OF THE COAST GUARD

On March 1, 2001, the BCMR sent the applicant a copy of the Coast Guard's views and invited him to respond within 15 days. The applicant requested and was granted an extension and responded on April 17, 2001. He stated that he disagreed with the advisory opinion and that he believed the evidence and statements he had already submitted thoroughly refute the derogatory comments in the disputed OER.

### APPLICABLE REGULATIONS IN THE PERSONNEL MANUAL

*Responsibilities of the Rating Chain*

Each OER is prepared by the reported-on officer's "rating chain" of three senior officers: the supervisor (usually the officer to whom the reported-on officer answers on a daily basis), the reporting officer (usually the supervisor's supervisor), and the reviewer (usually the reporting officer's supervisor, who need not have actually observed the reported-on officer's performance). Personnel Manual, Articles 10.A.2.d.1., e.1., and f.1. However, under Article 10.A.2.e.(1)(b), division chiefs, such as a district legal officer, may serve as both the supervisor and reporting officer on a subordinate's rating chain.

Article 10.A.1.b.(1) provides that "[e]ach commanding officer must ensure that accurate, fair, and objective evaluations are provided to all officers under their command."

Article 10.A.1.b.(2) states that "[t]here is only one person responsible for managing the performance of an individual officer .... and that is the officer himself or herself. He or she is ultimately responsible for finding out what is expected on the job, for obtaining sufficient feedback or counseling, and for using that information in adjusting as necessary to meet or exceed standards."

Article 10.A.1.c.(9), entitled "Performance Feedback," states that "[e]xcept for officers in the grade of ensign and lieutenant (junior grade), no specific form or forum is prescribed for performance feedback. It may be formal or informal. Performance feedback (or counseling) actually occurs whenever a subordinate receives from a rating officer any advice or observation related to the subordinate's performance or any other matter on which he or she may be evaluated. Performance feedback can occur in a conference, during a consultation or counseling session, or through on-the-spot comments about performance, or when the evaluation is returned. Each officer must be continuously alert for the "signals" received in one of these ways from seniors. If the signals are not clear (or understood), the officer should seek clarification or expansion on his or her own volition."

Article 10.A.2.c. provides that it is the responsibility of the reported-on officer to seek performance feedback, "as necessary," from the supervisor. It also provides that the reported-on officer "[a]ssumes ultimate responsibility for managing own performance, notwithstanding the responsibilities assigned to others in the rating chain. This includes ensuring performance feedback is thorough ... ."

Article 10.A.2.d.(2) provides that it is the supervisor's responsibility to "[p]rovide[] performance feedback to the Reported-on Officer upon that officer's request during the period or at such other times as the Supervisor deems appropriate." Under

Article 10.A.2.e.(2)(h), the reporting officer should also provide performance feedback "as appropriate."

### Instructions for Preparing an OER

Article 10.A.4.d.4. instructs supervisors to assign marks and write comments for the first 16 performance categories on an OER as follows (virtually identical instructions are provided in Article 10.A.4.d.7. for reporting officers, who complete the rest of the OER):

> (b)  For each evaluation area, the Supervisor shall review the Reported-on Officer's performance and qualities observed and noted during the reporting period.  Then, for each of the performance dimensions, the Supervisor shall carefully read the standards and compare the Reported-on Officer's performance to the level of performance described by the standards.  The Supervisor shall take care to compare the officer's performance and qualities against the standards--NOT to other officers and not to the same officer in a previous reporting period.  After determining which block best describes the Reported-on Officer's performance and qualities during the marking period, the Supervisor fills in the appropriate circle on the form in ink.
>
> • • •
>
> (d)  In the "Comments" sections following each evaluation area, the Supervisor shall include comments citing specific aspects of the Reported-on Officer's performance and behavior for each mark that deviates from a "4."  (Comments are required for Work-Life Sensitivity/Expertise, Operational/Specialty Expertise and Collateral Duty/Administrative Expertise regardless of mark assigned.)  The Supervisor shall draw on his/her own observations, from those of any secondary supervisors, and from other information accumulated during the reporting period.
>
> (e)  Comments should amplify and be consistent with the numerical evaluations in the evaluation area.  They should identify specific strengths and weaknesses in performance.  Well-written comments must be sufficiently specific to paint a succinct picture of the officer's performance and qualities which compares reasonably with the picture defined by the standards marked on the performance dimensions in the evaluation area.  Mere repetition of the phrases used in the standards is not sufficient narrative justification for marks.

Article 10.A.4.d.(9)(a) instructs the reporting officer to complete the Comparison Scale on an OER by "fill[ing] in the circle that most closely reflects the Reporting Officer's ranking of the Reported-on Officer relative to all other officers of the same grade the Reporting Officer has known."

Article 10.A.4.g. bars a rating chain member from mentioning certain matters in an OER, such as pending criminal proceedings, ongoing investigations, failures of selection for promotion, and medical diagnoses.  In the summer of 1997, there was no prohibition on mentioning another officer by name, although one was added later.  However, mentioning a "Reported-on Officer's performance or conduct which occurred outside the reporting period" was prohibited.

*Replies to OERs*

Article 10.A.4.g. allows the Reported-on Officer to file a reply to any OER within 14 days of receiving it to "express a view of performance which may differ from that of a rating official." However, a reply to an OER does not constitute an appeal or request for correction. OERs may only be corrected by the PRRB or the BCMR.

## FINDINGS AND CONCLUSIONS

The Board makes the following findings and conclusions on the basis of the applicant's military record and submissions, the Coast Guard's submission, and applicable law:

1.    The Board has jurisdiction concerning this matter pursuant to 10 U.S.C. § 1552. The application was timely.

2.    The applicant requested an oral hearing before the Board. The Chair, acting pursuant to 33 C.F.R. § 52.31, denied the request and recommended disposition of the case without a hearing. The Board concurs in that recommendation.

3.    The applicant has challenged the factual veracity of most of the comments in the disputed OER. The Chief Counsel argued that the comments in the OER should be accorded a strong presumption of regularity. *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992); *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979). He also argued that, under the decision of the Deputy General Counsel in BCMR Docket No. 2000-037 and *Muse v. United States*, 21 Cl. Ct. 592 (1990), the applicant could only rebut that presumption by presenting "clear, cogent, and convincing evidence to the contrary." In emphasizing this language, the Chief Counsel has strongly implied that applicants challenging OERs must meet a higher burden of proof than other applicants. However, the Board finds that in using the phrase "clear, cogent, and convincing," the Deputy General Counsel was describing the quality[3] of the evidence the applicant must present to overcome the presumption of regularity; she was not describing the applicant's burden of proof. This finding is supported by her decision in BCMR Docket No. 2000-058, wherein she stated that disputed OER comments and marks must be "rebutted by specific evidence to the contrary." For the reasons stated below, the Board finds that the proper burden of proof borne by an applicant challenging an OER is the preponderance of the evidence.

4.    In BCMR Docket No. 2000-037, the Deputy General Counsel, citing *Muse v. United States*, 21 Cl. Ct. 592, 602 (1990), stated that "no basis appears for the legal conclusion by the Board that, once prima facie 'proof' has been submitted by an applicant

---

[3] *See Woodby v. INS*, 385 U.S. 276, 284 n.13 (1966) (noting distinction between quality of evidence required and burden of proof required in deportation proceeding).

... , the Coast Guard bears a burden of 'producing convincing evidence.' The burden of proof in a BCMR case remains upon the applicant, and it is the applicant who, in order to rebut the presumption that rating chain officials have acted correctly, lawfully, and in good faith, must produce clear, cogent, and convincing evidence to the contrary." She did not state, however, that she was raising the BCMR's long-standing burden of proof, which is the preponderance of the evidence, or that she was imposing a distinct, higher burden of proof on applicants challenging OERs than upon those challenging other military records.

  5.  In *Muse*, the plaintiff was an Army officer who challenged certain marks and comments in an OER and his failure of selection for promotion by an Army selection board. He had been denied relief first by the Army's Special Review Board, which reviews appeals of OERs, and then by the Army BCMR. The language in *Muse* that was cited by the Deputy General Counsel in BCMR Docket No. 2000-037 falls within the court's discussion of its own standard of review.[4] The court stated the following with respect to its review of the Army BCMR's decision:

> It is a well-settled principle of law that agency determinations of this sort are final unless they are arbitrary, capricious, unsupported by substantial evidence or contrary to law ....

> To demonstrate that the records considered by a selection board do in fact contain material legal errors and injustices and, as a consequence, were not "fair and equitable," a claimant must present "cogent and clearly convincing evidence." See, e.g., Cooper, 203 Ct. Cl. at 304-305. ...

*Id.* at 601-02. *Cooper v. United States*, 203 Ct. Cl. 300 (1973), concerned an Army Reserve officer who claimed that he should have been retired in a higher pay grade because of his legal education and experience. The court found the following:

> This court cannot overturn the two decisions of the Army [BCMR] unless they are found to be arbitrary, capricious, and not based upon substantial evidence, or are contrary to applicable laws and regulations. [Citations omitted]. This showing requires cogent and clearly convincing evidence. *Newman v. United States, 185 Ct. Cl. 269, 276 (1968); Stephens v. United States, 174 Ct. Cl. 365, 372, 358 F.2d 951, 954 (1966)*. There is a strong presumption that the board and the Secretary faithfully discharged their duties and the burden is upon the plaintiff to prove otherwise. ...

---

[4] It should be noted that the court in *Muse* also referred to the clear and convincing standard when summarizing the Army's arguments regarding the case. The court stated that the Army "relies on the test cited in Gruendyke v. United States, 226 Ct. Cl. 193, 195, 639 F.2d 745, 747 (1981), in alleging that Muse has failed to demonstrate, by the required quantum of clear and convincing evidence, that there were any material legal errors in need of correction." *Muse* at 599. The "clear and convincing evidence" requirement is never mentioned in the *Gruendyke* decision, which discusses a test for determining whether a material error in a record has caused a failure of selection. However, paragraph 9-7 of Army Regulation 623-105, which governed appeals of OERs at that time, provided that an officer had "to provide relevant material to clearly and convincingly establish that a contested OER is not an accurate assessment of his performance." *Paskert v. United States*, 20 Cl. Ct. 65, 69 (1990).

*Id.* at 304. The two cases cited in the *Cooper* case for the "cogent and clearly convincing evidence" requirement concern veterans' disability ratings. In both, as in *Cooper*, the language is used to describe the plaintiffs' burden in convincing the court to overturn a BCMR decision.[5] Therefore, the Board concludes that the courts' references to clear, cogent, and convincing evidence in this line of cases refer to their own requirements for overturning BCMR decisions as arbitrary and capricious and do not establish such as the burden of proof before this Board in an OER case.

6.    The burden of proof in a Coast Guard BCMR case is not specified in the Board's regulations at 33 CFR part 52. However, the burden of proof borne by applicants to the Board has long been the preponderance of the evidence.[6] In *Morris v. United States*, 171 Ct. Cl. 220 (1965), the Army BCMR had denied relief to a veteran who claimed that in calculating his retirement pay, the Army had erroneously failed to count three years he had served in the Kentucky National Guard, whose records for the pertinent years had been destroyed in a fire. The court found that the BCMR had "placed too heavy a burden of proof on the plaintiff. It was not necessary for him to produce 'clear and convincing evidence' of his National Guard service. That standard is applicable to certain special issues like fraud, but it does not govern the ordinary issues of fact in a pay case, such as this. The correct standard is the normal one of the preponderance of the evidence." *Id.* at 228.

7.    The PRRB has the following language requiring clear and convincing evidence in its regulations in paragraph 7 of COMDTINST 1070.10D:

> b.    The burden of proof is upon the applicant. Accordingly, to justify correction of a record, the applicant must produce clear and convincing evidence which overcomes the presumption of regularity with respect to the contested record and establishes that action is warranted to correct a material error.

Despite this instruction, in past years, the PRRB used a preponderance of the evidence standard in OER cases or more generally found that the applicants had succeeded or failed in overcoming the presumption of regularity.[7] Recently, however, many PRRB decisions have apparently used the clear and convincing standard.[8] In this applicant's case, the PRRB seemed to revert to the earlier standard since it stated that "as a matter

---

[5]   *Newman v. United States*, 185 Ct. Cl. 269, 276 (1968) (finding that "[p]laintiff has the burden of proving by clearly convincing proof that the board or the Secretary acted arbitrarily or capriciously"); *Stephens v. United States*, 174 Ct. Cl. 365, 372, 358 F.2d 951, 954 (1966) (finding that "[t]his court has held on many occasions that it has no power to review the decisions of the Secretary of one of the military departments or his authorized representatives in such a case unless the petitioner shows by cogent and clearly convincing evidence that such determinations are arbitrary, capricious, or not supported by substantial evidence"). *See also Hodakievic v. United States*, 6 Ct. Cl. 499, 501 (1984).

[6]   *See, e.g.*, BCMR Docket No. 145-94 (approved by the delegate of the Secretary).

[7]   *See, e.g.*, PRRB Docket Nos. 0005-99, 0013-99, 0018-99, 0028-98, 0026-98, 0020-97, 0005-93, 0048-92.

[8]   *See, e.g.*, PRRB Docket Nos. 0011-00, 0002-00, 0009-99.

**Final Decision in BCMR Docket No. 2000-194**                                    p. 38

of subjective evaluation, the supervisor's statements receive a presumption of regularity unless the Applicant can prove by a preponderance of the evidence that those statements are factually in error."[9]

       8.     It is also instructive to note the burdens of proof used by the other services' BCMRs in OER cases:

       a.     <u>Army</u>  In 32 C.F.R. § 581.3(e)(2), the rules for the Army BCMR state that it "begins its consideration of each case with the presumption of administrative regularity" and that applicants have "the burden of proving an error or injustice by a preponderance of the evidence."  However, paragraph 6-10 of Army Regulation 623-105, which governs OER appeals, provides the following regarding an appeal of an OER to a Special Review Board, a lower board which, like the Coast Guard's PRRB, provides a potential administrative remedy prior to BCMR review:

> a. The burden of proof rests with the appellant. Accordingly, to justify deletion or amendment of a report, the appellant must produce evidence that establishes clearly and convincingly that—
>     (1) The presumption of regularity referred to in paragraphs 3-57 and 6-6 should not be applied to the report under consideration.
>     (2) Action is warranted to correct a material error, inaccuracy, or injustice.
> b. Clear and convincing evidence must be of a strong and compelling nature, not merely proof of the possibility of administrative error or factual inaccuracy. If the adjudication authority is convinced that an appellant is correct in some or all of his/her assertions, the clear and convincing standard has been met with regard to those assertions.

In deciding OER cases, the Army BCMR habitually paraphrases this "clear and convincing" requirement in its summary of applicable regulations.  However, in its findings, it consistently uses the following language, when denying relief:[10]

> In order to justify correction of a military record the applicant must show to the satisfaction of the Board, or it must otherwise satisfactorily appear, that the record is in error or unjust.  The applicant has failed to submit evidence that would satisfy the aforementioned requirement.
>                         ● ● ●
> <u>DETERMINATION</u>:  The applicant has failed to submit sufficient relevant evidence to demonstrate the existence of probable error or injustice.

When granting relief, the Army BCMR uses more variable language, finding sometimes that the applicant has proved his case by the preponderance of the evidence and other

---

[9] PRRB Docket No. 0023-98, p. 2, op. 2.
[10] *See, e.g.,* Army BCMR Case Nos. AR2001052095, AR2001051719, AR2000050444, AR1999021847, and AR1999020801.

times that he has met his (unstated) burden of proof or that granting relief is "appropriate."[11]

     b.    Navy   In 32 C.F.R. § 723.3(e)(2), the rules for the Board for Correction of Naval Records (BCNR) state that it "may deny an application in executive session if it determines that the evidence of record fails to demonstrate the existence of probable material error." In addition, the BCNR "relies on a presumption of regularity" and ... [a]pplicants have the burden of overcoming this presumption" by presenting "substantial evidence to the contrary." In deciding OER cases, the BCNR finds either that the evidence submitted by the applicant was "insufficient to establish the existence of probable material error"[12] or that it was "sufficient to establish the existence of injustice warranting [removal or correction of the OER]."[13] The Navy has no lower board, like the Coast Guard's PRRB or the Army's Special Review Board, to review evaluations,[14] but the Marine Corps does. The regulations of the Marine Corps' Performance Evaluation Review Board, whose decisions are reviewed by the BCNR, provide that to justify correction of an OER, an applicant must "produce evidence of probable material error, substantive inaccuracy, or injustice. This burden is met when the applicant presents an amount of relevant evidence tending to prove that the allegations contained in the application are more likely true than not."[15]

     c.    Air Force   In 32 C.F.R. § 865.4(a), the rules for the Air Force BCMR state that the "applicant has the burden of providing sufficient evidence of probable material error or injustice." In deciding OER cases, the Air Force BCMR finds either that "sufficient" or "insufficient" "relevant evidence has been presented to demonstrate the existence of probable error or injustice."[16] The Air Force's lower board, the Evaluation Reports Appeal Board, "works under the assumption that evaluation reports are accurate and objective. The applicant asking for reevaluation must therefore provide strong evidence to overcome the report's presumed validity."[17]

     9.    A burden of proof that requires evidence of "probable error or injustice" or "probable material error or injustice" is essentially a preponderance of the evidence standard since each implies that the applicant must convince the Board that his allegations are more likely true than not, or—to use an artificial numerical value—at least 51 percent likely. Thus, it is clear that each of the other services' BCMRs requires applicants who challenge performance evaluations to prove their cases by a preponderance

---

[11] See, e.g., Army BCMR Cases No. AR1999033930, AR2000038972, AR2000042865, AR2000037992, AR1999031236, and AR1999025724.

[12] See, e.g., BCNR Docket Nos. 3760-99, 3328-99, 8526-98, 8224-98, 4313-98, 3495-98, and 2618-98.

[13] See, e.g., BCNR Docket Nos. 3027-99, 8451-98, 7751-98, 7421-98, 6612-98, 3415-98, and 1300-98.

[14] See Naval Bureau of Personnel Instruction 1610.10, Annex S, para. S-11.

[15] Marine Corps Order 1610.11C, para. 10.a.

[16] See, e.g., Air Force BCMR Docket Nos. 00-02461, 00-02493, 00-03043, 00-03322, 98-00348, 98-00655.

[17] Air Force Instruction 36-2401, para. 1.1.3.

of the evidence—i.e., "the greater weight of the credible evidence"[18]—not by the "clear, cogent, and convincing" standard propounded by the Coast Guard. This is true even for the Army BCMR, which like this Board, has a lower board whose regulations require members appealing evaluation reports to present "clear and convincing" evidence.

10.    The Coast Guard BCMR, like those of the other services, was established by Congress under 10 U.S.C. § 1552 to correct errors and injustices in members' military records. The Board knows of no reason why the burden of proof borne by Coast Guard members should be more onerous than that borne by other servicemembers or why the burden of proof borne by applicants challenging an OER should be greater than that borne by applicants challenging other records.[19] However, the fact that the burden of proof is the same for OER cases as for other cases does not mean that it is just as easy for an applicant challenging an OER to meet his burden of proof. Whereas most military record entries are signed by at most one superior officer, OERs are signed by two or three superior officers, who are in turn evaluated on their proficiency at evaluating subordinates. Therefore, an OER may carry more evidentiary weight than another type of record entry, and it may be more difficult for an applicant challenging an OER to present sufficient evidence to prove by a preponderance of the evidence the existence of an error or injustice in the OER.

11.    Although the Deputy General Counsel, in BCMR Docket No. 2000-037, mentioned the need for "clear, cogent, and convincing" evidence, she did not state that it was the burden of proof for applicants challenging performance evaluations; she stated that such evidence was needed to overcome the presumption of regularity. The Board concludes that the Deputy General Counsel was merely noting the quality[20] of evidence an applicant must present to rebut the presumption of regularity.[21] Once the applicant has rebutted the presumption of regularity by presenting at least some "clear,

---

[18] 30 AM. JUR. 2d §§ 338, 339.

[19] "Absent an allegation of fraud or a statute or a court rule requiring a higher standard, the standard of proof in administrative hearings is generally a preponderance of the evidence." 2 AM. JUR. § 363. This is also the standard of proof established under § 556(d) of the Administrative Procedure Act. *Steadman v. SEC*, 101 S. Ct. 999, 1007-08 (1981). The Coast Guard cannot mandate a higher burden of proof for OER cases before the Board simply by setting a higher burden of proof for OER appeals before the PRRB.

[20] *Woodby v. INS*, 385 U.S. 276, 284 n.13 (1966).

[21] Courts have required various amounts and kinds of evidence to find that a presumption has been overcome. *See, e.g., Cone v. Caldera*, 223 F.3d 789, 792-93 (D.C. Cir. 2000) (holding that, under Army Rule 623-105, "an officer seeking a correction must prove 'clearly and convincingly' that the 'presumption of regularity' in the preparation of administrative records should not apply"); *Luria v. United States*, 231 U.S. 9, 27 (1913) (finding that "substantial and convincing explanation" is necessary to overcome a statutory presumption); *Baldwin v. West*, No. 96-1170, 13 Vet. App. 1, 6 (1999) (finding "clear evidence to the contrary" necessary to overcome a presumption); *Universal Maritime Corp. v. Moore*, 126 F.3d 256, 262 (4th Cir. 1997) (holding that "substantial evidence" was required to rebut the presumption that an injury was work related); *FDIC v. Schaffer*, 731 F.2d 1134 (4th Cir. 1984) (holding that "clear and convincing" evidence was required to overcome a presumption that certified mail was received).

cogent, and convincing" evidence—i.e., not just a general character reference but evidence that specifically and convincingly contradicts his rating officials' marks and comments—the Board weighs the evidence in the record and determines whether the applicant has met his burden of proof—the preponderance of the evidence—with respect to the comment or mark.[22]    The Board determines whether the applicant has proved by a preponderance of the evidence that the disputed OER was adversely affected by a "misstatement of significant hard fact," factors "which had no business being in the rating process," or a prejudicial violation of a statute or regulation.[23]    With this standard in mind, the Board has carefully considered all of the evidence presented regarding the OER disputed in this case and draws the following conclusions with respect to the evidence.

12.    **COMMENT [A]**    "[The applicant's] performance declined after completion of the OER preceding his selection for Commander.

The applicant pointed out that he was selected for commander three months after the beginning of the almost 14-month evaluation period covered by the disputed OER.    CAPT T., who was his reporting officer during the first four months of the period, stated that he noticed "no marked decline" in the applicant's performance during those months.    Neither of these facts even suggests that there was no decline in the applicant's performance after he was selected for promotion to commander, during the last ten or eleven months of the evaluation period.    Therefore, he has not overcome the presumption of regularity with respect to comment [A].

13.    **COMMENT [B]**    "He was surprised by developments in criminal prosecution of two environmental law enforcement cases which had been referred by the D7 legal office to the US Attorney in the Virgin Islands.    The inexperienced Asst US Atty had incorrectly applied CG LE authority; [he] was slow to realize the serious implications of a loss based on bad reasoning, and slow to provide litigation support to correct the erroneous legal analysis."

The record indicates that CAPT A. expected the applicant to have communicated more with the AUSAs about the two environmental cases before they asked him to review their drafts in December 1996 and January 1997, and the applicant has not proved that this expectation was unreasonable.    Statements by the applicant, CAPT A., and CDR D. indicate that the applicant initially failed to notice a potential problem with

---

[22]    In determining the preponderance of the evidence, the Board continues to consider the evidentiary weight of the rating chain's assessment even though the presumption of regularity has been rebutted.    *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 n.10 (1981).

[23]    *Hary v. United States*, 618 F.2d 704, 708 (Cl. Ct. 1980); CGBCMR Docket No. 86-96.

AUSA1's reliance on 14 U.S.C. § 89 in the response to the motion to suppress and to persuade AUSA1 to rely on other authorities.[24]

The applicant submitted notes indicating that he prepared comments on the AUSAs' drafts after CDR D. identified the potential problem. He also submitted copies of letters from the AUSAs praising him highly for his expeditious help in preparing the briefs for the suppression hearings and in identifying legal issues and one from CDR D. in which he stated that the issues raised by DOJ were "appropriately and timely addressed." These submissions constitute sufficient clear and convincing evidence to overcome the presumption of regularity accorded comment [B]. However, neither AUSA nor CDR D. indicated that the applicant contributed significantly to the work on this particular issue. Moreover, the record indicates that, even after CDR D. identified the issue, the applicant's comments for the second case had to be revised on Thursday, January 30, 1997, to incorporate CDR D.'s research on the problem, delaying his submission to AUSA2 by a day. Given these facts and CAPT A.'s statements, the Board finds that the applicant has not proved by a preponderance of the evidence that comment [B] is false or unjust.

14.    **COMMENT [C]** "Even then, he did not develop list of environmental enforcement cases he was responsible for managing until directed to do so."

Because the applicant has not proved that comment [B] was inaccurate or unjust and he admitted that CAPT A. did ask him to prepare such a list, he has not overcome the presumption of regularity accorded to comment [C].

15.    **COMMENT [D]** "In high profile criminal prosecution of a cruise line for discharging oil in US territorial seas, ultimately gathered over 9000 pages of CG documents concerning the cruise line from units throughout the CG, but only after his unsuccessful informal attempts to shift responsibility for the work to peers in D7 Marine Safety Staff, and after very specific direction and timetable imposed by [CAPT A.] for accomplishing task. Delay in response needlessly impaired relations with DOJ prosecutors. Even then, he did not take initiative to ensure records were complete until questioned by the DOJ."

The applicant submitted affidavits from the Chief of the Marine Response Branch and the Deputy Chief of the Marine Safety Division. Both strongly denied the allegation that the applicant had tried to shift the responsibility for gathering the documents onto their staff. Both indicated that the applicant worked closely with them in gathering the documents and that their office had to be involved because CGIS would not do the work and the applicant did not personally have access to the records that had to be gathered. Therefore, the Board finds that the applicant has overcome the presumption

---

[24] Apparently, CAPT A., who reviewed AUSA1's draft and the applicant's comments, also failed to notice the issue until CDR D. called him in January.

of regularity and proved by a preponderance of the evidence that the comment "but only after his unsuccessful informal attempts to shift responsibility for the work to peers in D7 Marine Safety Staff," is erroneous and should be removed from the disputed OER.

The record indicates that the applicant worked for several months to gather the documents by forwarding DOJ's document requests by e-mail, rather than by drafting formal letters. In February 1997, DOJ inquired about the completeness of the documents submitted in response to its requests. Since the applicant apparently did not know how complete the submissions were, CAPT A. felt obliged to give him a "very specific direction and timetable" to respond. The applicant has not presented sufficient evidence to overcome the presumption that the part of comment [D] that concerns the direction and timetable was correct and fair. Nor has he proved that CAPT A.'s apparent expectation that he would have checked the completeness of the submissions before DOJ's inquiry was unreasonable or that the comment regarding his failure to initiate the check was erroneous or unfair.

It is not clear from the record to which "[d]elay in response" to a DOJ request the comment in the disputed OER refers. However, the applicant admitted that at least one response to DOJ for documents was delayed because his subordinate did not follow through on the assignment. DOJ identified 36 illegible pages and asked for legible copies on May 16, 1997. The applicant delegated the task to a subordinate because he was preparing for and trying a special court-martial. The court-martial ended on May 22nd, and on May 27th, the applicant discovered that his subordinate had not taken any action on DOJ's request. Thus, the response in this instance may have been delayed by eleven days. In addition, it is also clear from the record that CAPT A. was unhappy with the pace of the document retrieval overall. The Board finds that the applicant has not overcome the presumption of regularity with respect to the comment about the delay and its effect on the office's relationship with DOJ. He submitted no contrary evidence concerning the timeliness of his document submissions or the office's relations with DOJ.

16.    **COMMENT [E]** "Although completing his second year as Chief, General Law Section, he did not analyze legal basis for major D7 marine safety initiative to apply Caribbean Cargo Ship Safety Code on 1 July 1997. [CAPT A.] found serious flaws in legal basis of initiative in close review as time for implementation approached, then assigned another attorney who worked hard and successfully to remedy legal defects by pushing authority through CG, DOT and [OMB] to ensure CG had enforcement authority before deadline."

The record indicates that Operation Safety Net was planned before the applicant became Chief of the General Law Branch, that it was implemented in 1994, and that the phase of the operation at issue in this comment was to be implemented in July 1997,

soon after he was to leave the office. CAPT A. apparently raised the issue of the legal basis for the July 1997 phase of the operation in March 1997, and the record indicates that the applicant responded promptly, even if he did not agree with CAPT A. about how "serious" the identified "flaw" was. Three affidavits submitted by the applicant call into question CAPT A.'s own judgment about this issue. Regardless of the validity of the legal judgments, however, the Board finds that comment [E] erroneously implies that the applicant was primarily responsible for handling the legal aspects of planning and implementing the July 1997 phase of the operation and for the "serious flaws" in its legal basis. In addition, the latter part of comment [E] comments on the work of two other attorneys, providing a clear comparison with the work of the applicant. Such comparisons are prohibited under Article 10.A.4.d.7(b) of the Personnel Manual. Therefore, the Board finds that the applicant has overcome the presumption of regularity and proved by a preponderance of the evidence that comment [E] is erroneous and unjust in its characterization of the applicant's performance of duty and that it contains a comparison that is prohibited under the regulations. It should be removed from the disputed OER.

17.    **COMMENT [F]**   "Tends to be overbearing and sarcastic with subordinates when under any pressure and when he believes he is not being observed by seniors."

The applicant submitted three affidavits from his subordinates in the office and one from his previous reporting officer directly refuting CAPT A.'s comment that he tended to be overbearing and sarcastic with his subordinates. The accuracy of comment [F] is also somewhat suspect because the record suggests that CAPT A. personally witnessed only one incident where he thought the applicant might have been overbearing or sarcastic, and that incident has been denied by both the applicant and the chief yeoman involved; and yet CAPT A. used the word "tendency," which implies more than one incident, and assumed that he could read the applicant's mind and know that he "believed" he was unobserved during these incidents. In his declaration, CAPT A. reaffirmed the comment but refused to elaborate. The Board finds that the applicant has overcome the presumption of regularity and proved by a preponderance of the evidence that comment [F] is false or at least greatly exaggerated and should be removed from the record.

18.    **COMMENT [G]**   "Surprised [phrase deleted by PRRB] by requirement for an annual report. Days before Christmas 1996 tasked YNC with completing the report and departed on leave, while she struggled with gathering information from commands throughout the district. Overwhelmed YNC sent e-mail tasking D7 units requiring submission of data soon after Christmas; [CAPT A.] cancelled unit tasking and assigned another attorney to assist YNC."

The applicant has not proved that it was unreasonable for CAPT A. to have expected him to ensure that the gathering of information for the annual FOIA report was begun before the reminder was received from Headquarters on December 19, 1996. However, the affidavit of the YNC submitted by the applicant clearly and directly refutes CAPT A.'s characterization of the impact of the applicant's delay on her. Her statement overcomes the presumption of regularity accorded comment [G] in this respect. The YNC indicated that she had handled the gathering of information for the report in previous years and that, before CAPT A. told her to stop, all she had done was to send out an e-mail requesting the information, just as she had done in previous years. It is clear from the record that the YNC merely sent out an e-mail message that was similar to messages she had sent out in prior years, and that she was not "over-whelmed" by the task. Therefore, the Board finds that the applicant has overcome the presumption of regularity and proved by a preponderance of the evidence that the comment "while she struggled with gathering information from commands throughout the district. Overwhelmed" is erroneous. Therefore, that part of comment [G] should be removed from the record.

19.    **COMMENT [H]**    "Trial Counsel in 2 courts-martial, but delayed in scheduling second court despite approaching detachment, with the result that another attorney had to be assigned to assume duties associated with record of trial."

The applicant stated that the Coast Guard completed the investigation for the second case in January 21, 1997. The record indicates that he was working on the envi-ronmental crimes cases at that time and so began collecting evidence, interviewing wit-nesses, and preparing the charge sheet on January 28, 1997. He submitted the charge sheet on February 10, 1997, but indecision on the part of his command about the charges and a delay by the new convening authority caused the charge sheet not to be finalized until March 17, 1997. Thereafter, the dates were determined by the convening author-ity, the defense counsel's schedule, and the judge. The dates appear on the trial Chro-nology Sheet, which was submitted by the applicant. The proceedings ended on May 22, 1997, and the court reporter submitted an unusable transcript on June 6, 1997, and again on June 11th. On June 12, 1997, the applicant asked a different court reporter to work on the transcript, and he received a usable version on June 16, 1997, just four days before his transfer. The Board finds that this evidence is sufficiently clear and convinc-ing to overcome the presumption of regularity accorded CAPT A.'s statement that the applicant intentionally delayed the second court-martial.

CAPT A.'s declaration in response to these claims strongly suggests that he was unaware of the cause of the delay in the second court-martial but, in drafting the OER, assumed that the applicant could have avoided the delay. He also supported his criti-cism by suggesting that the applicant had a base motive for delaying the case and by alleging that the applicant assembled the record of trial negligently. He did not identify any point at which the applicant personally delayed the trial, as comment [H] states.

Therefore, the Board finds that the applicant has proved by a preponderance of the evidence that the part of the comment that states "delayed in scheduling second court despite approaching detachment, with the result that" is erroneous and unfair and should be removed from the record.

20.    **COMMENT [I]** "Employed CGIS agents to effect service of criminal subpoenas/civil penalty packages, but did not pursue other ideas he was given to test commercial process servers."

The affidavit of the Chief of the Port Safety and Security Branch strongly supports the applicant's allegations and directly refutes comment [I]. The record indicates that after the Chief asked CAPT A. for help with effecting service of process in civil cases, the applicant did in fact conduct a test of a commercial process server, contrary to the statement in comment [I]. While the applicant may have "grudgingly" agreed to conduct the test, as CAPT A. alleged, comment [I] does not refer to his attitude at all but indicates that he neglected to test commercial process servers. However, the Chief's affidavit confirms that the applicant researched the available process-serving firms and conducted an experiment with one firm. When the experiment failed, both the applicant and the Chief recommended to CAPT A. that they abandon the effort because there was no established funding source for hiring commercial process servers and because they had good reason to believe that other firms would fail as well. CAPT A. apparently concurred in that decision because the experiment ended. Although the PRRB suggested that CAPT A. might have given the applicant "other ideas," which he did not pursue, CAPT A. did not identify any such "other ideas" but instead criticized the applicant's attitude and the failure of the experiment. Therefore, the Board finds that the applicant has overcome the presumption of regularity and proved by a preponderance of the evidence that the part of comment [I] that states "but did not pursue other ideas he was given to test commercial process servers" is inaccurate and unjust and should be removed from the OER.

21.    **COMMENT [J]** "Passive review of permits proposed by Aids to Nav. Branch for construction/alteration of bridges did not identify obvious issues with admittedly standard language authorizing permittees to close Inter Coastal Waterway for 90 days."

The record indicates that the applicant and CAPT A. reviewed and approved several bridge permits containing the boilerplate in question before the issue addressed in this comment arose. After the Intercoastal Waterway in a part of their district was closed for five days because of bridge construction, CAPT A. scrutinized the boilerplate in the next permit that came under review and suggested that it be amended to avert such closures because it seemingly allowed waterway closures of up to 90 days. The applicant had already reviewed the permit and suggested revisions only to the environmental provisions. Because the boilerplate had been used successfully for 30 years, the

Chief of the Bridge Section was adamantly opposed to amending it, and apparently the applicant agreed with him.  Thereafter, the boilerplate remained unchanged, but CAPT A. introduced reviews by Marine Safety Offices and the District Marine Safety Division into the bridge permit approval process.

The applicant submitted significant evidence indicating that his review of bridge permits as Chief of General Law resulted in several corrections and improved environmental documentation, which indicates that his review of permits in general was not "passive."  In addition, it is not at all "obvious" to the Board how the boilerplate could authorize a permittee to close the waterway for 90 days without the consent of the District Commander.  The language clearly requires obstructions to be removed "promptly" upon the District Commander's judgment that such action should be taken.  The 90-day provision merely requires the District Commander to make that judgment no more than 90 days after the bridge is open to traffic.  Therefore, although the applicant did not spot the issue CAPT A. spotted, the Board finds that he has rebutted the presumption of regularity and proved by a preponderance of the evidence that his permit reviews were not "passive" and that the 90-day closure issue was not so "obvious" that he was negligent not to have recommended amending the boilerplate.

22.    **COMMENT [K]**  "[The applicant] was counseled about his performance early and repeatedly during the period."

The record indicates that the applicant was formally counseled about his performance on June 14, 1996.  Although this session was called a "pep talk" by CAPT T. and focused on his performance during the previous evaluation period, the Board finds that it should have put the applicant on notice that his rating chain found his recent performance to be lacking.  This warning was underlined just ten days later when, according to the applicant, CAPT A. asked him in response to some late work, "Did you think I wouldn't notice."  Moreover, this question strongly suggests that a significant amount of acrimony and mistrust already existed between the applicant and CAPT A. at the start of the evaluation period.  The record further reveals that several significant professional disagreements and/or misunderstandings arose between them during the evaluation period and that CAPT A. resorted to asking the applicant to prepare a list of his environmental cases and to meet certain deadlines.

While CAPT A. may not have called another formal counseling session, counseling does not only occur in formal sessions, and it is clear from the record that the applicant was on notice throughout the evaluation period that CAPT A. was dissatisfied with some of his work.  Article 10.A.1. of the Personnel Manual does place ultimate responsibility on the reported-on officer to discover his rating chain's expectations and adjust his performance to meet them.  The Board finds that the applicant has not overcome the presumption of regularity with respect to comment [K] or proved by a pre-

ponderance of the evidence that he was not informed of CAPT A.'s disapproval of his performance.

23.    **COMMENT [L]**  "[CAPT T.], D7 Legal Officer until he retired on 31 AUG 96, warned him to correct the decline in his performance."

CAPT T. stated that the June 14, 1996, counseling session was not a "warning" to the applicant but more of a "pep talk." CAPT T.'s statement constitutes clear and convincing evidence that he did not intend to give the applicant a "warning," and thus rebuts the presumption of regularity on this issue. Nevertheless, CAPT T.'s statement does not persuade the Board that the applicant was not or should not have been "warned" by the comments made during the session that he needed to correct a decline in his performance. The applicant admitted, and both CAPT T. and CAPT A. indicated, that CAPT T. expressed some concerns about a recent decline in the applicant's performance. CAPT T. stated that he asked the applicant to "redouble his striving." Therefore, the Board finds that the applicant has not proved by a preponderance of the evidence that he was not told, or "warned," by CAPT T. that he should try to improve his performance.

24.    **COMMENT [M]**  "As with the long running difficulties detailed in block 3h in supporting the high-profile cruise line case, he grudgingly accepted positive suggestions for improvement, and responded only to firm direction."

Because the Board has determined that comment [E] regarding the cruise line case should be removed from the OER, the Board finds that the first part of comment [M] should also be removed. However, the applicant has not presented any evidence to overcome the presumption of regularity concerning CAPT A.'s characterization of how he accepted suggestions and took direction.

25.    In BCMR Docket No. 151-87, it was held that "an OER will not be ordered expunged unless the Board finds that the entire report is infected with the errors or injustices alleged; unless the Board finds that every significant comment in the report is incorrect or unjust; or unless the Board finds it impossible or impractical to sever the incorrect/unjust material from the appropriate material." It would be possible to redact the erroneous, prohibited, and unjust comments from the OER. However, some of the comments (part of [D], [F], and [H]) that the Board has found to be erroneous or unjust indicate that CAPT A. unreasonably ascribed a base, unprofessional motive to the applicant without sufficient knowledge of the circumstances or justification. Other comments ([E], [J]) indicate that CAPT A. criticized the applicant for poor performance when the record strongly suggests that the applicant merely held a different but reasonable legal opinion.

Moreover, it is impossible for the Board to determine the extent to which the numerical marks in the disputed OER are based on these erroneous and unfair comments. Therefore, the Board is persuaded that the OER is so "infected" that it is "impossible or impractical to sever the incorrect/unjust material from the appropriate material." Therefore, the entire OER, including the OER reply, should be removed from the applicant's record.

26.    Accordingly, the applicant's request should be granted.


**[ORDER AND SIGNATURES APPEAR ON NEXT PAGE]**

## ORDER

The application of CDR xxxxxxxxxxxxxxxxxx, USCG, for correction of his military record is granted.  His officer evaluation report (OER) covering the period May 1, 1996, through June 20, 1997, shall be removed from his record and replaced with an OER prepared "for continuity purposes only."


_____

Kevin C. Feury


_____

Michael K. Nolan


_____

Karen L. Petronis